The NATIONAL CONFERENCE OF CATHOLIC BISHOPS, The United States Catholic Conference, Inc., Appellants,

v.

William French SMITH, Attorney General of the United States, et al.

No. 80–1283.

United States Court of Appeals, District of Columbia Circuit.

Argued March 4, 1981.

Decided April 14, 1981.

**536**

Wilfred R. Caron, Washington, D. C., for appellants.

Jonathan Ginsburg, Atty., Dept. of Justice with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty. and Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D. C., were on the brief for appellees.

Before MacKINNON and ROBB, Circuit Judges and AUBREY E. ROBINSON, Jr.,* United States District Judge for the District of Columbia.

Opinion Per Curiam.

PER CURIAM:

Appellants challenge the constitutionality of the Pregnancy Discrimination Act, (the Act), Pub.L. No. 95–555, 42 U.S.C. § 2000e(k), 92 Stat. 2076, and the Equal Employment Opportunity Commission's Guidelines on Sex Discrimination, 29 C.F.R. Part 1604, which interpret the Act. Their principal contention is that in the exercise of their First Amendment right to freedom of religion, they properly declined to provide certain abortion-related benefits to their employees contrary to the requirements of the Pregnancy Discrimination Act. In support of their contention appellants seek a declaratory judgment that the Act, amending Title VII of the Civil Rights Act of 1964, as amended, and the related guidelines of the Equal Employment Opportunity Commission violate the First and Fifth Amendments of the United States Constitution with respect to the conduct of appellants and their class. Appellants also prayed for a Temporary Restraining Order [1] and preliminary and permanent injunctions.[2]

The record and briefs were filed and the cause was argued by counsel. After giving full consideration to the entire record and arguments of counsel, it is the judgment of this court that the District Court properly declined jurisdiction because of the absence of any "case of controversy" as required by

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1.     (b) Enter a Temporary Restraining Order pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining and restraining the Defendants, their agents, employees and attorneys from enforcing or executing Pub.L. 95–555, 92 Stat. 2076, to require Plaintiffs National Conference of Catholic Bishops and United States Catholic Conference, Inc., and the members of the class of employers represented to provide paid time off from work for women employees for all abortions, and to pay all expenses for women employees who wish to have abortions "where the life of the mother would be endangered if the fetus were carried to term," or from taking any other action to require Plaintiffs or the members of their class to make such payments. (JA 36).

2.     (c) Enter preliminary and permanent injunctions pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining and restraining the Defendants, their agents, employees and attorneys from enforcing or executing Pub.L. 95–555, 92 Stat. 2076, to require plaintiffs National Conference of Catholic Bishops and United States Catholic Conference, Inc., and the members of the class of employers represented to provide paid time off from work for women employees for all abortions, and to pay all expenses for women employees who wish to have abortions "where the life of the mother would be endangered if the fetus were carried to term", or from taking any other action to require Plaintiffs or the members of their class to make such payments. (JA 36).

the United States Constitution, Article III, and we affirm the decision of the District Court for the reasons stated in its Memorandum Opinion, which is set forth as an *Appendix* hereto.[3]

*Judgment accordingly.*

## APPENDIX

### MEMORANDUM OPINION

PRATT, District Judge:

Plaintiffs, the National Conference of Catholic Bishops (NCCB) and The United States Catholic Conference, Inc. (USCC),[1] challenge the constitutionality of the Preg-nancy Discrimination Act of 1978, Pub.L. No. 95–555 § 1, 42 U.S.C. § 2000e(k),[2] and of the Equal Employment Opportunity Commission's (EEOC) Guidelines on Sex Discrimination, 44 Fed.Reg. 23804–09 (1979) (to be codified in 29 C.F.R. § 1604.10), which interpret the Pregnancy Discrimination Act (PDA). In response to plaintiffs' First and Fifth Amendment claims for injunctive and declaratory relief, the government[3] has filed a motion to dismiss for lack of jurisdiction and failure to state a claim upon which relief can be granted. We hold that the plaintiffs' complaint fails to meet the threshold constitutional requirement of

**3.** Since the case was submitted appellants have referred us to the decision in *Newport News Shipbuilding and Drydock Co. v. EEOC*, 510 F.Supp. 66 (E.D.Va.1981). In that opinion EEOC guidelines issued under the Pregnancy Discrimination Act were struck down. The guidelines provided that if an employer provides benefits for medical procedures to spouses of employees, then the employer must pay pregnancy benefits for the spouses of employees. The court struck down these guidelines because the legislative history of the statute supported a determination that pregnancy benefits were to extend *only* to women *employees.* The court also found a case or controversy to exist since the guidelines had been distributed to the employees, since the union "espoused" the guidelines, and since the union and a male employee had filed a charge with the EEOC arising out of the employer's failure to fully comply with the guidelines.

There is nothing in *Newport News* that conflicts with our decision. The substantive aspect of the guidelines at issue in *Newport News* is irrelevant to the issue before this court. The case or controversy holding is distinguishable because, regardless of whether it is correct, in *Newport News* charges had been filed by an arguably aggrieved employee against the company while in this case no such charges have been filed. It was the lack of a complaining party, among other things, that the district court found to indicate that no case or controversy existed in the instant case.

**1.** Plaintiffs also seek to represent a "class consisting of all employers who have objection on moral, ethical or religious grounds to the practice of abortion...." The named plaintiffs themselves must, however, meet the case or controversy requirements. *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). Our decision to dismiss the complaint for lack of subject matter jurisdiction renders decision on plaintiffs' motion to certify unnecessary.

**2.** The Pregnancy Discrimination Act was enacted as a compromise reached in conference to resolve the differences between the House and Senate versions of S. 995. As finally enacted, it provided for *paid sick leave benefits* for the pregnancy, childbirth, or related medical conditions and would include elective or optional abortions. On the other hand, it would not require an employer to pay *health insurance costs* for abortions, except when the life of the mother would be endangered if the fetus were carried to term, or where medical complications have arisen from an abortion, elective or otherwise. Specifically, the provision reads:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortions, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: *Provided,* That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

42 U.S.C. § 2000e(k).

**3.** The Department of Justice with EEOC attorneys, acting of counsel, represent all of the defendants: the Attorney General, the Secretary of Labor, the EEOC, the Chairman of the EEOC, and the EEOC Commissioners.

presenting a "case or controversy" and that even if the complaint did meet this primary requirement, the case would not be ripe for adjudication. Consequently, without reaching the merits of the complaint, which raises matters of serious importance, we dismiss it for lack of subject matter jurisdiction.

## BACKGROUND

In 1976, the Supreme Court in *Gilbert* held that Title VII of the Civil Rights Act of 1964 did not include differentiation in treatment on the basis of pregnancy within its prohibitions against discrimination on the basis of sex. *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). Congress reacted to this decision in 1978 by enacting the PDA, which extends the coverage of Title VII in order to prohibit sex discrimination on the basis of pregnancy, childbirth, or related medical conditions, in particular, in the provision of medical fringe benefits. Related medical conditions include abortions. In the light of concerns about abortions expressed by NCCB, other groups and numerous individuals, both houses of Congress considered potential First Amendment free exercise problems and, as indicated in footnote 2, compromised on the language and the exemptions in the present statute. *See* H.R.Rep.No.1786, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Ad. News 4749, 4765–66; 124 Cong.Rec. S18,978 (daily ed. Oct. 13, 1978), (remarks of Sen. Williams); *Id.*, S18,978–79 (remarks of Sen. Javits).

On April 20, 1979, the EEOC issued its "Final Interpretive Guidelines," including questions and answers, on its interpretation of the PDA. Shortly thereafter, on April 29, 1979, the Act became effective as to

existing benefit and insurance programs. At the time of the hearing on the government's motion to dismiss, November 30, 1979, the EEOC had not initiated any kind of action to investigate violations of the PDA nor to enforce the PDA against anyone.[4] Furthermore, the EEOC had not received any private complaints under the PDA.

The plaintiffs filed their complaint on June 21, 1979, and an amended complaint on July 11, 1979.[5] They allege that, as employers of fifteen or more persons, both fall within the application of the PDA and are in noncompliance with the provisions thereof and with the EEOC guidelines.[6] An affidavit of Samuel J. Di Misa, who as the Director of Personnel of NCCB and USCC, is responsible for plaintiffs employee fringe benefit health insurance, and disability benefit programs, provides the single brief and general description of the plaintiffs' insurance programs and their alleged noncompliance with the PDA. (Ex. W attached to plaintiffs' Opposition Memorandum). Di Misa's affidavit states that plaintiffs were able to convince their insurers to omit the coverage for abortions from plaintiffs' health insurance and long-term disability policies. To underscore the immediacy of their interests and their standing, as parties suffering injury, to bring this action, plaintiffs allege that USCC is an agent of a party or a party respectively, to two refugee resettlement contracts, one with the State Department, the other with the State of Florida and that these contracts are subject to termination because of plaintiffs' alleged violation of the PDA. In particular, plaintiffs allege that Executive Order No. 11,246, 3 C.F.R. 339 (1964–65 Compilation), *reprinted in* 42 U.S.C. § 2000e note, at 125 (1976), *as amended*, requires the

---

4. Plaintiffs originally filed their complaint with a motion for a temporary restraining order. At the hearing thereon, the government indicated that it was unaware of any violations by plaintiffs and promised to refrain from acting against plaintiffs until this case was resolved; consequently, we denied plaintiffs' request for a TRO.

5. Hereinafter referred to as "complaint."

6. Although courts will accord "great deference to the interpretation given [a] statute" by the agency that is concerned with the statute, *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 14 L.Ed.2d 283 (1965), the guidelines are only interpretations and do not have the force of law. *General Electric Co. v. Gilbert*, 429 U.S. 125, 141, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976).

Secretary of Labor to enforce compliance with the PDA by government contractors such as plaintiffs. Separate guidelines exist for discrimination under Executive Order No. 11,246. *See* 41 C.F.R. Part 60–20 (1979). Since the hearing on the motion to dismiss, the Secretary of Labor has proposed regulations under the Executive Order that would require compliance by government contractors with the PDA. *See* 44 Fed.Reg. 77,008, 77,016 (1979). The proposed rules which were drafted in consultation with the EEOC are open for comment until February 26, 1980. *Id.* at 77,006.

The plaintiffs' complaint includes three counts.[7] The first alleges that the PDA requires all employers subject to the Act to provide *sick leave* for all abortions including elective abortions contrary to plaintiffs' moral, ethical, and religious convictions and, consequently, creates an unconstitutional burden on plaintiffs' First Amendment free exercise rights. The second count asserts that the PDA requires plaintiffs to pay for all the *expenses* of abortions "where the life of the mother would be endangered if the fetus were carried to term" contrary to and impermissibly burdening plaintiffs' free exercise right to determine when an abortion is justifiable according to their beliefs. The third count claims that the last provision of the PDA permits businesses and unions to negotiate agreements to deny all abortion benefits but denies plaintiffs the same right in violation of the Fifth Amendment.

### CASE OR CONTROVERSY

Article III of the Constitution requires that those who seek to invoke the power of the federal courts must demonstrate the existence of a "case or controversy" as a threshold requirement. *O'Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). This is long-settled doctrine requiring no extensive citation of authority and is rooted in the concept of

justiciability. The limitations of this doctrine on the jurisdiction of federal courts to consider cases was held to mean that federal courts are:

without power to give advisory opinions, . . . to decide abstract, hypothetical or contingent questions, . . . to decide any constitutional question in advance of the necessity for its decision, . . . or to decide any constitutional question except with reference to the particular facts to which it is to be applied. . . .

*Alabama State Federation of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945). Thus, federal courts are prevented from issuing advisory opinions when a complaint does not present sufficient concrete legal issues. *United Public Workers of America v. Mitchell,* 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). To raise a concrete legal issue a plaintiff must demonstrate that injury or the threat of injury is both "real and immediate," not "conjectural" or "hypothetical." *Golden v. Zwickler,* 394 U.S. 103, 108–110, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). It is clear that in the instant case plaintiffs have failed to satisfy this necessary preliminary requirement.

Although a plaintiff may not need under all circumstances to wait until he is subjected to actual enforcement of a statute, *see Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the mere existence of a statute or regulation that a plaintiff reasonably believes should apply to and be enforced against him does not ordinarily create a justiciable case or controversy. *United Public Workers of America v. Mitchell, supra,* 330 U.S. at 91, 67 S.Ct. at 565; *National Student Association v. Hershey,* 412 F.2d 1103, 1110 (D.C.Cir. 1969). Even the "chilling" of the most protected First Amendment rights of free speech does not create a case or controversy without a "specific present objective harm or a threat

---

**7.** Subsequent to the hearing on the motion to dismiss, plaintiffs moved to file a second amended complaint to add a fourth count alleging that the PDA is unconstitutional because of overbreadth. The overbreadth argument was briefed by both sides before the hearing and

was addressed at the hearing. Consequently, amendment of the complaint does not raise any issues that we have not already considered and we accordingly deny plaintiffs' motion to further amend.

of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–2326, 33 L.Ed.2d 154 (1972).

(a) *Lack of Adequate Factual Record—Hypothetical Posture*

In this case we face a question that is not presented in concrete adversarial terms. The government has not initiated and, according to the record before us, does not plan to institute any kind of proceedings against the plaintiffs. It has not developed a factual record of any kind with respect to plaintiffs' programs. Plaintiffs themselves have only described their programs and their employees in general terms, *e. g.*, they employ "310 lay persons, a substantial number of whom are non-Catholic lay women." (Complaint, ¶ 8). Plaintiffs have not alleged what kind of sick leave, disability, or health insurance programs they provide. We lack sufficient facts to analyze how the PDA actually impacts on the plaintiffs although they allege that it does. For example, in rejecting a rider to their group policy, they advised their carrier that they would agree to disability benefits resulting from or arising out of or during pregnancy but would exclude disability benefits resulting from voluntary abortions or sterilization for contraceptive purposes. (Ex. W–3 attached to plaintiffs' Opposition Memorandum). Apparently this exclusion from coverage applies to both sexes on a nondiscriminatory basis and is at least in part not inconsistent with Title VII. Likewise, we can only speculate on how the plaintiffs would find out that a woman was claiming a day of sick leave for an abortion rather than for a minor respiratory ailment or was claiming medical benefits for an abortion rather than for some other surgical procedure.[8]

Plaintiffs' alleged failure to provide programs in and of itself does not violate the PDA. This is because a potential violation would not occur until an employee actually demands and is denied equal benefits, which benefits could be provided on an *ad hoc* basis by plaintiffs acting as self-insurers. Plaintiffs fail to allege how many, if any, of their employees are women of child-bearing age or that any of them have or would seek the limited benefits of the PDA that the plaintiffs oppose. Apparently no employee has demanded such benefits and employees of these two religious organizations are as likely to be aware of plaintiffs' opposition to abortions as they are unlikely, as a consequence of their awareness, to request such benefits.[9]

In the absence of a concrete factual dispute, even plaintiffs' position is unclear. Plaintiffs' memoranda focus in part on the alleged "abuse" of their right to determine whether a mother's life is endangered. They state:

> The terms of the statute do not permit employers whose moral, ethical and religious convictions require close scrutiny of the practice of abortion to make the complex yet unavoidable decision as to whether or not the given procedure indeed falls within the morally permissible class.

Plaintiffs' Temporary Restraining Order, p. 3. They therefore imply that some abortions may be morally permissible when a mother's life is endangered. On the other hand, their exhibits on Catholic doctrine concerning abortion appear to indicate that no abortion is justified by the fact that the mother's life is "endangered" if the fetus is carried to term. Thus again, it is a matter for conjecture whether or how or under what precise circumstances plaintiffs might be in noncompliance with the PDA.

**8.** Our comparisons are intended to reflect the relative seriousness of the medical procedures involved and are not intended by any means to trivialize or understate plaintiffs' serious concerns about abortions.

**9.** Congress provided an exemption to permit religious organizations to discriminate on the basis of religion when hiring employees to conduct their religious activities. *See* 42 U.S.C. § 2000e–1 (1976). Plaintiffs have apparently chosen not to hire in this permissibly discriminatory manner, which would further reduce, if not totally preclude, the potential for a violation of the PDA.

Even if we hypothesize that a situation could arise in which the plaintiffs would be in violation of the PDA and we speculate that an employee could file a complaint with the EEOC, EEOC's reaction to such a complaint is all the more conjectural in the light of the present disarray in its position, as discussed below.

(b) *Lack of Immediacy*

In this case, the absence of a problem of sufficient immediacy underscores the lack of an actual "case or controversy," even more than the absence of an adequate factual record. The mere existence of a statute does not create a "case or controversy," particularly when, as here, the position of the government itself is far from definite and certain as to what the statute requires with the consequence that action is either unlikely or, at least, not imminent. Both plaintiffs and the *amici*[10] point out inconsistencies between the EEOC guidelines and the government's interpretation of the PDA in its memoranda, which the EEOC as co-counsel endorsed.

The EEOC position on the meaning of the PDA is in a state of confusion and important problems of statutory interpretation and broad policy are focused in at least two areas. First, does the PDA imply that religious employers such as plaintiffs are required to provide paid sick leave only to the extent that they are required to pay for the costs of abortions as a health insurance benefit? The government's memoranda argue for this narrow reading of the exclusion. Questions and answers 35 and 36 in the EEOC guidelines, however, as does the statute itself, refer to employers in general without limitation. The EEOC interpretation in question and answer 35 expressly

limits the exemption to health insurance benefits, but requires all employers to pay sick leave for elective abortions. Second, does the PDA require payment of everything including health insurance benefits for an elective abortion if complications arise? The government memoranda is in the affirmative; EEOC question and answer 36 state that the employer need not provide the health insurance benefits that would actually pay the costs of an elective abortion. These examples are typical of the conflict between the government's interpretation of the PDA and the guidelines as literally written.

We can only speculate that the EEOC either has decided to change its recent interpretation of the PDA as reflected in the guidelines or has heeded counsels of caution from the Justice Department, which may very well be aware of the constitutional problems arising from the EEOC's interpretation of the statute. In either case, the probability that the EEOC, particularly with its staggering caseload of pending cases which is a matter of public record, will begin active enforcement of the PDA against anyone, let alone the plaintiffs, is even more conjectural. The record, as it is, does make clear that Congress carefully considered the First Amendment free exercise implications of the PDA. Consequently, at this juncture, it would be most imprudent for this court to interject itself, until the EEOC decides what the PDA requires, issues a definitive interpretation and commences active enforcement against these plaintiffs. As the Supreme Court pointed out more than thirty years ago when the Hatch Act was passed:

> Should the courts seek to expand their power so as to bring under their jurisdic-

10. The court granted leave to file an *amici curiae* memorandum, of points and authorities on behalf of the League of Women Voters, the National Organization of Women, the Coalition of Labor Union Women, and Women's Equity Action League Education and Legal Defense Fund, Inc. The *amici* supported the government's motion to dismiss, but opposed the government's interpretation of the statute on the merits, which as we said earlier, we do not reach. Furthermore, the *amici* noted that al-

though the issue was not before us, they opposed the PDA's exclusion of health insurance benefits to cover the costs of elective abortions as a violation of the First Amendment's establishment clause. Thus, the *amici* in strident tones oppose the plaintiffs' arguments. The *amici's* interpretations of the statute and of the Constitution underscore the necessity of waiting for a truly concrete and adverse case or controversy, which, as we discuss below, must also be ripe.

tion ill-defined controversies over constitutional issues, they would become the organ of political theories. Such abuse of judicial power would properly meet rebuke and restriction from other branches. . . .

*United Public Workers of America v. Mitchell,* 339 U.S. 75, 90–91, 67 S.Ct. 556, 564–565, 91 L.Ed. 754 (1947). This absence of an immediate prospect that the government [11] will apply this aspect of the PDA to anyone provides good reason against adjudicating matters that may be affected in uncertain ways by future events. *See, International Longshoremen's and Warehousemen's Union, Local 37 v. Boyd,* 347 U.S. 222, 223–24, 74 S.Ct. 447, 448, 98 L.Ed. 650 (1954); *United Public Workers of America v. Mitchell, supra,* 339 U.S. at 91, 67 S.Ct. at 564.

**(c)** *Lack of Chilling Effect*

The plaintiffs have also claimed that the PDA is overbroad on its face, chills the exercise of First Amendment free exercise rights, and, consequently, we should hold that it is unconstitutional. We cannot accept this simplistic solution and therefore disagree. In this circuit, the Court of Appeals has perceptively noted:

> The [Supreme] Court spread the justiciability question along a continuum ranging between "a general threat by officials to enforce those laws which they are charged to administer" and "a direct threat of punishment against a named [party] . . . for a completed act." Suits predicated on threats nearer the "general" pole are not justiciable; suits nearer the direct pole are.

*National Student Association v. Hershey,* 412 F.2d 1103, 1111 (D.C.Cir. 1969) (*quoting United Public Workers of America v. Mitchell, supra* 339 U.S. at 88, 67 S.Ct. at 563). The Court of Appeals placed the *Hershey* suit at the "general threat" end of the

spectrum, but then found that the chilling of First Amendment *free speech* rights might rise to a level that would create a justiciable exception. 412 F.2d at 1114. But even in free speech cases, the exception is narrow and the courts must apply it on a case-by-case basis. *Id.* at 1115. As a general principle then, merely alleging the chilling even of First Amendment rights of free speech or expression does not automatically create a justiciable case or controversy. *Id.* at 1106, 1114–15; *see Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–2326, 33 L.Ed.2d 154 (1972). This, of course, is not a free speech case.

The *Hershey* court used three factors to determine whether a claim of so-called chilling effect changed a generalized threat of possible enforcement into a justiciable case or controversy. The three factors are:

> (1) the severity and scope of the alleged chilling effect on First Amendment freedoms, (2) the likelihood of other opportunities to vindicate such First Amendment rights as may be infringed with reasonable promptness, and (3) the nature of the issues which full adjudication on the merits must resolve; and the need for factual referents in order properly to define and narrow the issues.

*National Student Association v. Hershey, supra,* at 1115. It is clear that plaintiffs cannot meet these criteria. First, the plaintiffs in an affidavit have demonstrated that they were able to maintain their religious practices by convincing their insurers to omit the coverages to which they object. Consequently, the First Amendment rights of the named plaintiffs have not been adversely affected. Second, if the EEOC began an enforcement proceeding plaintiffs could vindicate their rights by raising their constitutional defenses before the court in such a case. Third and finally, it is not clear under the facts as they now exist

---

**11.** If the EEOC does not present more than a speculative threat to plaintiffs, then action by the Secretary of Labor or his Office of Federal Contract Compliance Program (OFCCP) is even more hypothetical, especially if, as the plaintiffs assert, the Secretary were required by Executive Order No. 12,067, 3 C.F.R. 206 (1979), *reprinted in* 42 U.S.C. § 2000e note, at 128 (1979), *as amended,* to follow the leadership of the EEOC in regards to the enforcement of policies on discrimination. Furthermore, as the plaintiffs point out, the termination of their refugee contracts would fall most heavily on the refugees.

whether a claim would arise or how it would arise.

Since *Hershey*, the Supreme Court has narrowed the chilling effect doctrine and emphasized that the doctrine primarily concerns free speech or expression that is chilled by the existence of criminal statutes. *See Broadrick v. Oklahoma*, 413 U.S. 601, 615–16, 93 S.Ct. 2908, 2917–2918, 37 L.Ed.2d 830 (1973). Our research has not produced any authority that the chilling effect doctrine has been extended to suits such as this one that raise First Amendment free exercise problems. The Seventh Circuit rejected an argument similar to the plaintiffs' and held that when a plaintiff has the opportunity for judicial review before a statute is enforced against him that the chilling effect is avoidable. *See Grutka v. Barbour*, 549 F.2d 5, 9–10 (7th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977).

The case of *Surinach v. Pesquera de Busquets*, 604 F.2d 73 (1st Cir. 1979), relied on by plaintiffs at oral argument for the proposition that First Amendment free exercise rights are subject to the same protection as are First Amendment free speech rights, is clearly distinguishable on its facts.

(d) *Lack of Ripeness*

Finally, even if the plaintiffs presented a case or controversy a challenge to the PDA at this time would also fail for lack of ripeness. This deficiency involves consideration of many of the same factors considered previously under the hearings of lack of an adequate factual record and lack of immediacy. Ripeness is a matter of judicial discretion in contrast to the constitutional mandate that a case or controversy be presented. In commenting on the appropriateness of judicial restraint which underlies this doctrine, the Supreme Court has expressed its rationale as follows:

> Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a two-fold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (footnote omitted); *see Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1098 (D.C.Cir. 1970). To determine whether the case was appropriate for judicial decision the Court considered whether the issues were purely legal ones and whether the challenge was to final agency action. *Abbott Laboratories v. Gardner, supra* 387 U.S. at 149, 87 S.Ct. at 1515.

We have carefully considered the factor of fitness for decision. We repeat that although plaintiffs characterize their complaint as a pure question of law, the various questions of fact discussed above require extensive refinement and elaboration in order to present a mature case. Furthermore, this complaint does not involve a challenge to final agency action. Indeed, as discussed above, the EEOC has not finally settled on its interpretation of the statute, has not initiated any action, and is unlikely to do so until it decides what the PDA requires. Likewise, the Secretary of Labor has only recently presented for public comment proposed rules, which, if finalized without change in spite of EEOC's uncertain position on the PDA, might lead to an eventual review of plaintiffs' alleged noncompliance with the PDA.

To sum up, plaintiffs' various allegations of injury are premature and are not appropriate for judicial resolution at this time. These issues may be raised in any future suit by the EEOC or in any future administrative proceeding by the Secretary of Labor. Plaintiffs will have ample opportunity to present their constitutional defenses in the context of such proceedings, should they

even take place. The present case is simply not ripe for the resolution of these issues.

## CONCLUSION

We are fully cognizant of the serious concerns of the plaintiffs and of the importance of the issues they seek to have adjudicated. Nonetheless, we are compelled to decline jurisdiction for the reason that under the facts presented, there exists no "case or controversy," which is the basis for federal jurisdiction under Article III of the Constitution.

Accordingly, we have entered an order of dismissal without prejudice.

(JA 7–21).