UNITED CHRISTIAN SCIENTISTS, David James Nolan and Lucile J. Place, Plaintiffs,

v.

CHRISTIAN SCIENCE BOARD OF DIRECTORS OF the FIRST CHURCH OF CHRIST, SCIENTIST, Defendant.

Civ. A. No. 83-3486.

United States District Court, District of Columbia.

Aug. 15, 1985.

Arnold P. Messing, Boston, Mass., for plaintiffs.

Daniel F. Kolb, Washington, D.C., for defendant.

MEMORANDUM AND ORDER

JACKSON, District Judge.

Plaintiffs United Christian Scientists ("UCS"), an unincorporated association of religionists, and two individual believers, David James Nolan and Lucile J. Place, seek a declaration of the unconstitutionality of a private copyright law enacted by Congress in 1971 as repugnant to the Establishment and Free Exercise Clauses of the First Amendment to, and the Copyright Clause of Article I, Section 8 of, the U.S. Constitution. Defendant is the governing board of the First Church of Christ, Scientist, of Boston, Massachusetts, also known as the Mother Church, the current owner of the copyright in issue (hereinafter the "Church").[1] The case is now before the Court on crossmotions for summary judgment. For the reasons set forth below, the Court finds the law to be unconstitutional as having been enacted in violation of the Establishment Clause (and does not, therefore, reach the remaining issues), and will grant plaintiffs' and deny defendant's motion for summary judgment.

I.

The undisputed facts are established by the parties' respective Local Rule 1–9(i) Statements and supporting affidavits.

Defendant First Church of Christ, Scientist, was founded more than a century ago

---

1. Jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1338 and 1346. The original defendant, the U.S. Register of Copyrights, was dismissed on June 14, 1984, the Church having been added as a defendant as the real party in interest.

by Mary Baker Eddy. During her lifetime Mrs. Eddy wrote numerous versions of an original sacred work known as *Science and Health With Key to the Scriptures* ("*Science and Health*"), the religion's central theological writing, which, along with the Bible, is regarded as the Pastor of the Christian Science Church. The Church presently publishes the 1906 edition of *Science and Health*, which incorporates textual changes made by Mrs. Eddy between 1906 and 1910, and it is this so-called "final edition" which the Church makes available worldwide through its network of Christian Science Reading Rooms. Sunday sermons in every Church of Christ, Scientist, are comprised of pre-planned readings from correlative passages of the Bible and the 1906 edition of *Science and Health*, and are published in advance in the "Christian Science Quarterly," a Church publication which is widely disseminated, so that individual church members may study the sermons in the week preceding the service.

Mary Baker Eddy copyrighted various editions of *Science and Health*, the first in 1875 and the last in 1906, but copyrights were never obtained for many versions, and Mrs. Eddy made more than 4,000 changes in the work between 1906 and her death in 1910 alone. Despite extensions obtained under general copyright law, all editions except the 1906 edition had passed into the public domain prior to 1971 when Private Law 92–60, 85 Stat. 857 (1971), was enacted.[2]

In 1976 plaintiff United Christian Scientists, (which claims a current international membership of 11,000 and a mailing list of several thousand more) was formed by a group of adherents to Christian Science who desired to revitalize the religion through proselytism and broad dissemination of all of Mary Baker Eddy's writings. To that end plaintiffs Nolan and Place, Chairman and a trustee, respectively, of UCS, have established a Christian Science Institute in Hawaii from which they plan to undertake worldwide distribution of *Science and Health* (and excerpts thereof) in book and audio-cassette form. It is plaintiffs' belief, however, that the 1906 edition of *Science and Health* is *not* the definitive version, and they wish to publish and disseminate other editions of the text for study and teaching, an activity in which plaintiffs assert they are inhibited by the existence of the copyright acquired by defendant by Private Law 92–60.

Private Law 92–60 grants to the trustees under Mary Baker Eddy's will[3] the copyright to "all editions [of *Science and Health*] ... in English and translation heretofore published, or hereafter published by or on behalf of said trustees, their successors or assigns, for a term of seventy-five years from the effective date of this Act or from the date of first publication, whichever is later." The effective copyright term for all editions of *Science and Health* extant in 1971 is thus extended until 2046 (and, arguably, subsequently-published editions would each be protected for 75 years from their date of publication).

## II.

The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an · establishment of religion...." In *Everson v. Board of*

---

**2.** General copyright legislation in effect between 1831 and 1909, the period in which Mary Baker Eddy herself published, provided for an initial copyright term of 28 years and a 14–year renewal term. Act of February 3, 1831, 4 Stat. 436. In 1909, Congress amended the statute to provide for an initial term of protection of 28 years and a renewal term of 28 years. Act of 1909, 35 Stat. 1075. As a consequence, renewal in 1934 of the copyright registration for the 1906 edition of *Science and Health* extended it until 1962, when it would have expired but for year-to-year extensions enacted by Congress pending its revision of the Copyright Act. That revision, passed in 1976, established a copyright term of the lifetime of the author plus 50 years. 17 U.S.C. § 302(a). The 1976 Act also provided that copyrights extended under the yearly acts would expire 75 years from the date the copyright was originally obtained, which, in the case of the 1906 edition, was 1981. 17 U.S.C. § 304(b).

**3.** The trustees under Mrs. Eddy's will are the members of the Board of Directors of the Church, although defendant asserts that the two groups are not necessarily coextensive.

*Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, *reh'g denied,* 330 U.S. 855, 67 S.Ct. 962, 91 L.Ed. 1297 (1947), the Supreme Court said:

> The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.... Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between Church and State."

*Id.* at 15–16, 67 S.Ct. at 511.

The "wall of separation" has never since, to be sure, been conceived of as an impenetrable barrier, *see Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745, *reh'g denied,* 404 U.S. 876, 92 S.Ct. 24, 30 L.Ed.2d 123 (1971); *Committee for Public Education v. Nyquist,* 413 U.S. 756, 760–61, 93 S.Ct. 2955, 2958–59, 37 L.Ed.2d 948 (1973); *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 1361–62, 79 L.Ed.2d 604, *reh'g denied,* —— U.S. ——, 104 S.Ct. 2376, 80 L.Ed.2d 848 (1984), and the fact that a law may operate to the advantage of religion certainly does not alone render it unconstitutional. *See Mueller v. Allen,* 463 U.S. 388, 393, 103 S.Ct. 3062, 3065, 77 L.Ed.2d 721 (1983); *Lynch v. Donnelly,* 104 S.Ct. at 1362. But Establishment Clause apprehensions are nevertheless aroused whenever governmental action appears to bestow an official beneficence on religion in general, or on a partic-

ular denomination or sectarian enterprise, for, as the Supreme Court has most recently said, "Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations as when it attempts to inculcate specific religious doctrines." *Grand Rapids School District v. Ball,* —— U.S. ——, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985). Where legislatures have succeeded in conferring benefits upon religious entities without offending the Establishment Clause there have been factors present which have attenuated the appearance of official favor, such as that the benefits were indirect or remote, *Committee for Public Education v. Nyquist,* 413 U.S. at 771, 93 S.Ct. at 2964; *Widmar v. Vincent,* 454 U.S. 263, 273–74, 102 S.Ct. 269, 276, 70 L.Ed.2d 440 (1981), or that the suspect legislation distributed its bounty among the secular and sectarian alike and was formulated with a general public policy goal in mind.[4]

The inquiry which must be made with respect to Private Law 92–60 is not simply reducible, as defendant would have it, to whether religions may ever derive benefit from private acts of Congress, or whether original works of theological import may ever be given the protection of copyright. They may, and they obviously have,[5] but the issue is considerably more complex. Whimsical as its results may seem in particular cases, *see Wallace v. Jaffree,* —— U.S. ——, 105 S.Ct. 2479, 2517–19, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting), the Supreme Court has articulated a three-part test to be utilized by courts in

---

**4.** The Supreme Court has held constitutional a number of programs benefitting sectarian institutions. *See, e.g., Everson v. Board of Education, supra,* (reimbursement of costs of bus transportation to parents of parochial school students); *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (loan of secular textbooks to all schoolchildren, whether in public or private schools); *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790, *reh'g denied,* 404 U.S. 874, 92 S.Ct. 25, 30 L.Ed.2d 120 (1971) (federal grants to private colleges and universities for construc-

tion of facilities to be used for secular purposes); *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (property tax exemptions to religious organizations).

**5.** Defendant has submitted evidence of some 77 current copyrights on theological writings, including 34 separate translations or editions of the Bible. It has also cited 24 private acts of Congress since 1946 which have conferred benefits upon a multitude of religious organizations.

assaying legislation which provokes Establishment Clause challenges:

> First, the statute must have a secular legislative purpose; second its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the statute must not foster "an excessive government entanglement with religion."

*Lemon v. Kurtzman,* 403 U.S. at 612–13, 91 S.Ct. at 2111 (citations omitted).[6]

Applying the *Lemon* test to the law in dispute here, the Court finds that it is the benefit to members of the general public, if any, which is incidental or remote; aid to "religion" is at the heart of the legislation. Private Law 92–60 was openly sought and passed to secure prospective advantage for the hierocracy of one particular religion, and to no discernible advancement of the general welfare, circumstances which render it vulnerable under both parts one and two of the *Lemon* test and incompatible as well with the general principle of governmental neutrality toward religion the First Amendment commands. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 92, 96 S.Ct. 612, 669, 46 L.Ed.2d 659 (1976) (*per curiam*); *Committee for Public Education v. Nyquist,* 413 U.S. at 792–93, 93 S.Ct. at 2975; *Wallace v. Jaffree,* 105 S.Ct. at 2492.

Defendant Church suggests that Private Law 92–60 shares the secular purpose common to all copyright legislation, viz., to "stimulate artistic creativity for the general public good." *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975). *See also Washingtonian Publishing Co. v. Pearson,* 306 U.S. 30, 36, 59 S.Ct. 397, 400, 83 L.Ed. 470 *reh'g denied,* 306 U.S. 668, 59 S.Ct. 588, 83 L.Ed. 1063 (1939). But it is certain that the only author of the only literary work which is the subject of this particular copyright law will not resume her creative efforts reassured by any protection it affords her heirs, temporal or spiritual.[7] The Church also cites to excerpts from the legislative history which intimate that Private Law 92–60 was intended to safeguard against "spurious or distorted" versions of *Science and Health* being "palmed off" upon the public as the genuine article. But that same legislative history in its entirety makes it clear that, when the bill which was to become Private Law 92–60 was under consideration, neither the lawmakers nor those who importuned them on its behalf had in mind to protect the public's purely profane interest in not being cheated. To the extent they were bent on saving the public at all, it was from false doctrine, not fraud.

In testimony given before the House subcommittee considering the bill the manager of the Washington office of the Christian Science Committee on Publication asserted that "the unusual nature" of *Science and Health* necessitated his plea for extended copyright protection, for without such protection "there would be a serious danger that the course of Christian Science church services and the basis of individual religious study by Christian Scientists would be seriously impaired." *For the Relief of Clayton Bion Craig, Arthur P. Wuth, Mrs. Lenore D. Hanks, David E. Sleeper, and DeWitt John: Hearings on S. 1866 Before Subcomm. No. 3 of the House Committee on the Judiciary,* 92d Cong., 1st Sess. 7–8 (1971). Another Church witness inveighed: "We have got to protect religion, we have got to protect what God

---

**6.** Although the Supreme Court has characterized this test as "no more than [a] helpful signpost" in analyzing Establishment Clause challenges, *Mueller v. Allen,* 463 U.S. at 394, 103 S.Ct. at 3066 (quoting *Hunt v. McNair,* 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973) ), it has itself nevertheless employed it in all but one such case, *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and its continued vitality is evidenced by three recent decisions. *Wallace v. Jaffree, supra; Grand Rapids School District v. Ball,* 105 S.Ct. at 3223 ("We therefore reaffirm that state action alleged to violate the Establishment Clause should be measured against the *Lemon* criteria."); *Aguilar v. Felton,* — U.S. —, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985).

**7.** The Church presently receives some royalties from the sale of *Science and Health,* but neither party contends that pecuniary interests underlie its posture in this case.

wants His children to hear." *Id.* at 22. The bill's sponsor, Senator Burdick, urged its passage as follows:

[I]t is absolutely essential to the free practice of their religious beliefs that Christian scientists, as well as those of the general public who wish to learn of this religion, be certain that any copy of *Science and Health* which they obtain be exactly the same as originally copyrighted by its author.... If the copyright of *Science and Health With Key to the Scriptures* should ever be permitted to expire, the book would fall into the public domain. Amended editions, annotated versions, modernized editions, and abridged editions could all be published and would cause great distress and confusion, not only among Christian Scientists, but among those of the general public wishing to obtain a correct and complete statement of the teachings of this religion.

117 Cong.Rec. S 26822 (1971). And, according to the Senate committee report:

The purpose of seeking copyright for this book is not to provide pecuniary profit or material gain for the Trustees or the Church, but to preserve and maintain the purity and integrity of the statement of the religious teachings of this denomination, and thereby to protect members of the public against the possibility that, in purchasing or otherwise acquiring ... [*Science and Health*], they might receive a distorted version of the teachings of Christian Science.

S.Rep. No. 92–280, 92d Cong., 1st Sess. (1971) (reprinted at 117 Cong.Rec. S 26821 (1971)).

Such proceedings have the sound of the 17th century to them. They are resonant of what might have occurred before the Committee on Religion of the last Parliament to sit before the English Revolution, but they are discordant in the context of contemporary American political debate. Heresy is no part of the business entrusted to Congress by the Constitution.

Finally, it is by no means assured that even the third part of the *Lemon* test—the absence of "excessive entanglement"—can be successfully negotiated to allow Private Law 92–60 to stand. While the law is unlikely to entail much in the way of administrative oversight, the same cannot be said with respect to further judicial engagement.[8] Both UCS and the Church are in accord that it is essential that the "purity" and "integrity" of *Science and Health* not be compromised. The Church professes that the text of the book must be exactly as Mary Baker Eddy wrote it, and that every detail, from the numbering of the pages to the arrangement of lines on each page, must be identical in all published copies of the same edition. Given Mrs. Eddy's prolificacy and the fact that the early versions of the book are very different from those that followed, ascertainment of the definitive version is likely to be both controversial and difficult, and even if a consensus were possible, plaintiffs maintain that they would still wish to publish and distribute earlier versions of the work to illuminate the course of Mrs. Eddy's revelation.

As with most copyright disputes, those arising under Private Law 92–60 will in all probability be resolved by resort to private

8. Congress was made aware, even before the appearance of the UCS schismatics, of the bill's particularly great propensity for involving government in a wholly internal religious dispute over the integrity of a sacred work. The report of the Bar Association of the City of New York, which recommended rejection of the legislation, and argued in no uncertain terms its unconstitutionality, stated:

[W]e confess ourselves unable to perceive how S. 1866 can be other than unconstitutional. Its purpose and its ultimate effect are to single out a particular doctrine within a particular church, to grant to writings embodying that doctrine protection that has never been made available to any other religious or nonreligious writings, and to supply civil and criminal sanctions against those who, religiously or non-religiously, whether calling themselves Christian Scientists or not, may choose to deviate from that doctrine.... [I]ronically, S. 1866 would deprive Christian Science dissidents of the right ... to select their own "sacred writings" if those writings happened to be those of Mary Baker Eddy. 117 Cong.Rec. S 46071–72 (1971).

litigation, in connection with which courts could be called upon to determine, for example, as to particular portions of her works, whether Mary Baker Eddy purported to write *ex cathedra* as the divinely inspired prophet of a new faith, or in some less exalted capacity, merely to decide whether they are within or without the copyright. Such controversies are best left to the theologians or to ecclesiastical tribunals, not the civil courts of the land.

For the foregoing reasons, therefore, it is, this 14th day of August, 1985,

ORDERED, that defendant's motion for summary judgment is denied; and it is

FURTHER ORDERED, that plaintiffs' motion for summary judgment is granted, and Private Law 92–60 is hereby declared to be unconstitutional; and it is

FURTHER ORDERED, that the copyright conferred by Private Law 92–60 is held to be null, void, and of no effect; and it is

FURTHER ORDERED, *sua sponte*, that the judgment entered hereby is stayed pending appeal.