**UNITED CHRISTIAN SCIENTISTS, et al.**

v.

**CHRISTIAN SCIENCE BOARD OF DIRECTORS, FIRST CHURCH OF CHRIST, SCIENTIST, Appellant.**

**No. 85–5959.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 28, 1986.

Decided Sept. 22, 1987.

Daniel F. Kolb, Washington, D.C., for appellant.

Arnold P. Messing, Boston, Mass., with whom Margaret H. Marshall, Boston, Mass., was on the brief, for appellees. David J. Hensler and Elliot M. Minceberg, Washington, D.C., also entered appearances for appellees.

Ronald A. Krauss, New York City, was on the brief for American Jewish Congress, amicus curiae, urging affirmance.

Before WALD, Chief Judge, ROBINSON, Circuit Judge, and EDWARD D. RE *, Chief Judge, United States Court of International Trade.

---

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

At issue in this case is the constitutional validity of Private Law 92–60,[1] which grants appellant, Christian Science Board of Directors of the First Church of Christ, Scientist (First Church), an extended copyright on all editions of *Science and Health with Key to the Scriptures (Science and Health)*, the central theological text of the Christian Science faith. Appellees, United Christian Scientists and David James Nolan and Lucile J. Place, two officers of a dissenting group of Christian Scientists, challenge Private Law 92–60, on grounds that it violates the Copyright Clause of the Constitution and, as well, the Establishment and Free Exercise Clauses of the First Amendment thereof.[2] Finding that both the purpose and the effect of Private Law 92–60 were to aid religion, the District Court held that it contravenes the Establishment Clause. We conclude that Private Law 92–60 offends fundamental principles of separation of church and state, and accordingly affirm.

## I

First Church was founded in the nineteenth century by Mary Baker Eddy. Christian Scientists follow the Bible as she expounded it in *Science and Health*. Together, the Bible and *Science and Health* are regarded as the pastor of the Christian Science Church,[3] and an edition of *Science and Health* is distributed worldwide through a network of Christian Science reading rooms. Sunday sermons are drawn from correlative passages of the Bible and *Science and Health*, and are published in advance in the *Christian Science Quarterly* to enable church members to study them during the preceding week.[4]

In her lifetime, Mary Baker Eddy continually revised *Science and Health*, and pub-

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. Priv.L. No. 92–60, 85 Stat. 857 (1971) [hereinafter Private Law 92–60].

2. U.S. Const. art. I, § 8, cl. 8; amend. 1. We refer herein to appellees collectively as United Christian Scientists.

3. *United Christian Scientists v. Christian Science Bd. of Directors,* 616 F.Supp. 476, 476–477 (D.D. C.1985).

4. *Id.*

lished numerous editions. She obtained copyrights on seventeen of these editions, beginning with the first edition in 1875.[5] While the edition of 1906 was the last Mrs. Eddy copyrighted, she made a vast number of additional changes in its text between 1906 and her death in 1910.[6] A 1910 "final edition" of *Science and Health* incorporating these changes was published shortly before her death, but never copyrighted, it passed into the public domain.[7] First Church held all copyrights obtained by Mrs. Eddy during her lifetime.[8] By 1971, the year the challenged copyright law was enacted, all editions except the one in 1906 had entered the public domain.[9] It is a version of the 1906 edition, apparently incorporating many if not all of the changes appearing in the 1910 edition, that First Church currently publishes and distributes to its reading rooms.[10]

United Christian Scientists is a group of Christian Scientists differing with First Church on matters of church membership and doctrine. So far as may be discerned from the record, the principal points of disagreement involve, both directly and indirectly, publication and distribution decisions concerning *Science and Health*. United Christian Scientists, which claims a current international membership of 11,000 and a mailing list of several thousand more, was formed by a group of adherents to Christian Science who desired to revitalize it through energetic proselytizing, primarily by means of worldwide dissemination of Mary Baker Eddy's writings in book and audio-cassette form.[11] It is its belief that the 1906 version of *Science and Health* currently published by First Church is not the definitive version of Mary Baker Eddy's work.[12] Rather, United Christian Scientists views the 1910 "final edition" of *Science and Health* as the ultimately authoritative statement of her teachings,[13] and it would like to distribute this edition by audio-cassette in complete and excerpt-

5. S.Rep. No. 280, 92d Cong., 1st Sess. 2 (1971) [hereinafter Senate Rep.]; Affidavit of David James Nolan, *United Christian Scientists v. Christian Science Bd. of Directors*, Civ. No. 83–3486 (D.D.C.) (filed Apr. 9, 1984) at 3, Record Excerpts for Appellant (R.E.) 11 [hereinafter Nolan Affidavit].

6. *United Christian Scientists v. Christian Science Bd. of Directors, supra* note 3, 616 F.Supp. at 477.

7. Nolan Affidavit, *supra* note 5, at 3–4, R.E. 11–12.

8. The trustees under Mary Baker Eddy's will are the members of the Board of Directors of First Church. We are told that the two groups are not necessarily coextensive. *United Christian Scientists v. Christian Science Bd. of Directors, supra* note 3, 616 F.Supp. at 477 n. 3.

9. *Id.* at 477.

10. Appellee Nolan states that between 1906 and 1910 Mary Baker Eddy made as many as 4,000 changes in the text of *Science and Health*, some major, as for instance a variance in the number of synonyms used to describe God. Nolan has "studied in detail the version of *Science and Health* which is now published" by First Church, and avows that it "is not a true replication of the final edition published in 1910 by Mary Baker Eddy, but is altered and contains numerous deletions and additions." Nolan Affidavit, *supra* note 5, at 3–5, R.E. 11–13; see also Affidavit of David James Nolan in Opposition to the Motion to Dismiss of the First Church of Christ, Scientist, *United Christian Scientists v. Christian Science Bd. of Directors*, Civ. No. 83–3486 (D.D.C.) (filed Aug. 30, 1984) at 9, R.E. 108 [hereinafter Nolan Affidavit in Opposition]. First Church, in response, contends that it distributes "the edition of *Science and Health* which was copyrighted in 1906 with changes in her text made by Mary Baker Eddy from then until her passing in 1910 ('final edition' ...)." Affidavit of H. Dickinson Rathbun, *United Christian Scientists v. Christian Science Bd. of Directors*, Civ. No. 83–3486 (D.D.C.) (filed July 1, 1984) at 3, R.E. 66 [hereinafter Rathbun Affidavit]. While this statement may be read to contradict Nolan's, it does not explicitly do so, and indeed may be read as asserting only that First Church incorporates in its 1906 edition some but not all changes made between 1906 and 1910. In its briefs, appellant appears to concede that there could be a dispute over the identity of the so-called "final edition." See Brief for Appellant at xviii; Reply Brief for Appellant at 31.

11. *United Christian Scientists v. Christian Science Bd. of Directors, supra* note 3, 616 F.Supp. at 477; Nolan Affidavit in Opposition, *supra* note 10, at 1–2, R.E. 100–101.

12. Nolan Affidavit, *supra* note 5, at 9, R.E. 17 ("the Mother Church publishes and promotes a version of *Science and Health* which I do not believe is authentic"); see *id.* at 4–5, R.E. 12–13.

13. *Id.* at 4–5, R.E. 12–13.

ed form, an activity it believes will meet with opposition from First Church.

Since 1978, United Christian Scientists has produced and mailed audio-cassette tape recordings entitled "Hear Ye the Glad Sound?" approximately once a month to its subscribers. The recordings include news of the organization's activities, as well as readings and commentaries of a religious nature.[14] On at least two different occasions, "Hear Ye the Glad Sound?" has included material in which First Church has subsequently asserted copyright claims—one a reading of *Principle and Practice* by Mary Baker Eddy, and the other excerpts from a book on Mrs. Eddy by Gilbert Carpenter. In each instance, after receiving a notice of copyright infringement by First Church, United Christian Scientists felt compelled to recall the cassettes and re-move the copyrighted material, a process both expensive and time-consuming, as well as disruptive of its relations with "Hear Ye the Glad Sounds?" subscribers.[15]

It is the current intention of United Christian Scientists to disseminate to its subscribers recordings of the 1910 "final edition" of *Science and Health* in complete and excerpted form, the latter to include verbatim excerpts from the 1910 edition, interspersed with passages from other works and appellee Nolan's commentary thereon.[16] These materials clearly fall within the copyright granted First Church by Private Law 92–60.[17] United Christian Scientists fears that its planned reproduction and dissemination of *Science and Health* will meet with infringement charges by First Church akin to those asserted against it in the past.[18] It therefore

14. Nolan Affidavit in Opposition, *supra* note 10, at 5, R.E. 104.

15. *Id.* at 5–6, R.E. 104–105.

16. *Id.* at 7–8, R.E. at 106–107.

17. See text *infra* at notes 20–22.

18. First Church's prior aggressive resort to its copyright to immobilize United Christian Scientists is not, however, the only basis for this concern. The Church candidly admits that it has recently prevented a party from publishing "a compilation of excerpts from *Science and Health*" on the ground that the "form [was] not faithful to the original text." Rathbun Affidavit, *supra* note 10, at 2, R.E. 65. Although the Church subsequently explained that it took action against the excerpted text in the belief that it "was misleading because it created the incorrect impression that Mary Baker Eddy wrote the pamphlet," the Church nowhere suggests that this is the sole situation in which it would view excerpting as "[un]faithful to the original text." Affidavit of H. Dickinson Rathbun, *United Christian Scientists v. Christian Science Bd. of Directors,* Civ. No. 83–3486 (D.D.C.) (filed Oct. 9, 1984) at 2, R.E. 115 [hereinafter Second Rathbun Affidavit]. United Christian Scientists fears that its planned distribution format "would constitute 'excerpts' such as prompted the objection of First Church." Nolan Affidavit in Opposition, *supra* note 10, at 8, R.E. 107.

At the root of the dissident group's apprehension, however, is the belief that its plan to disseminate what it believes to be the authentic 1910 final edition, rather than the version of the 1906 edition that the Mother Church currently publishes, see note 10 *supra* and accompanying text, will provoke strong and unchangeable objection. In Nolan's words, the "version of Sci-ence and Health* published by First Church ... is not a true replication of [Mary Baker Eddy's] final edition but is altered and contains numerous deletions and additions that United Christian Scientists will correct in the final edition it intends to distribute ...," and that such an edition "would necessarily be regarded by First Church as 'unfaithful.'" Nolan Affidavit in Opposition, *supra* note 10, at 9, R.E. 108. Though First Church observes that it "has not required others ... to publish and distribute only the final edition," Rathbun Affidavit, *supra* note 10, at 3, R.E. 66, its adversary points out that the instances cited pertained to publication of rare editions of *Science and Health* not under copyright in the decades prior to passage of Private Law 92–60 and thereafter distributed only in insignificant numbers. Compare Rathbun Affidavit, *supra* note 10, at 3, R.E. 66, with Affidavit of Ralph Gerasdi, *United Christian Scientists v. Christian Science Bd. of Directors,* Civ. No. 83–3486 (D.D.C.) (filed Sept. 28, 1984) at 2–3, Record Document (R.) 38. See Nolan Affidavit in Opposition, *supra* note 10, at 8, R.E. 107. More importantly, no counter-example furnished by the Church involved publication of a variant of the final edition of *Science and Health,* that the Church itself distributes which was presented as the theologically authentic version of that text. Nolan insists that ongoing theological disputes between the parties will cause the Mother Church to take action against the competing "final edition" sought to be distributed by United Christian Scientists. Nolan Affidavit in Opposition, *supra* note 10, at 9–12, R.E. 108–111. While the Church's brief identifies "accurate" reproduction of any edition of the work as the Church's sole concern, see Brief for Appellant at 10; Reply Brief for Appellant at 32, 33, 34, the Church's affiant speaks instead of

has refrained from commencing publication, and counted on a judgment declaring that Private Law 92–60 is constitutionally infirm so that it might undertake publication without threat of suit.[19]

Private Law 92–60, enacted by Congress in 1971 when First Church's sole remaining copyright in the 1906 edition was in danger of lapsing,[20] grants the trustees under the will of Mary Baker Eddy a new copyright to

all editions [of *Science and Health* ] ... in English and translation heretofore published, or hereafter published by or on behalf of said trustees, their successors or assigns, for a term of seventy-five years from the effective date of this Act or from the date of first publication, whichever is later.[21]

By the terms of Private Law 92–60, then, the new copyright extends to all editions of *Science and Health:* the 1906 edition, to which First Church held a copyright at the time of the law's passage; editions in the

public domain, whose protection under the general copyright laws had lapsed; and editions in the public domain because never copyrighted. The 1971 private law extends the effective copyright term for all editions of *Science and Health* extant in 1971 until 2046, and by providing that subsequently published editions are each to be protected for 75 years from the date of first publication, it may empower First Church to maintain the copyright for an indefinite period in variant editions of *Science and Health* which it does not choose to publish.[22]

▬ In 1983, appellees instituted this litigation for declaratory relief, challenging the constitutionality of Private Law 92–60 in the United States District Court for the District of Columbia, and naming the Register of Copyrights as defendant.[23] The District Court subsequently dismissed the Register of Copyrights and ordered that First Church, as the real party in interest, be substituted.[24] The court denied the mo-

"faithful" reproduction of the_work, see, e.g., Rathbun Affidavit, *supra* note 10, at 3, 4, R.E. 66, 67; Second Rathbun Affidavit, *supra,* at 2, R.E. 115. This parallels the testimony of Church witnesses supporting enactment of Private Law 92–60, who frankly admitted that their distress over variant editions was religiously motivated. See text *infra* at notes 50–56; Nolan Affidavit in Opposition, *supra* note 10, at 8–9, R.E. 107–108.

In the end, First Church offers United Christian Scientists no direct guaranty that it would acquiesce in the planned distribution of the 1910 edition, recorded in complete as well as excerpted and annotated formats. Rather, the Church simply reiterates its assent to publication of *Science and Health* in "editions [that] faithfully reproduce the text ... as written by Mary Baker Eddy," and in "a form ... faithful to the original text," pointing to other secular publications of the work it has condoned. Rathbun Affidavit, *supra* note 10, at 3–4, R.E. 66–67. In Nolan's view, these conditional assurances amount to veiled threats, which become ominous in light of the parties' theological dispute over the authentic version of the final edition, the competing religious ends to which *Science and Health* would be turned, and the Church's demonstrated willingness to enforce its copyright against United Christian Scientists, see text *supra* at note 15, and others, in the past. Nolan Affidavit in Opposition, *supra* note 10, at 8–12, R.E. 107–111.

**19.** Nolan Affidavit in Opposition, *supra* note 10, at 7, R.E. 106.

**20.** See Brief for Appellant at 5; see also note 28 *infra.*

**21.** Priv.L. No. 92–60, 85 Stat. 857 (1971).

**22.** By this reading, such editions of the text, in the public domain at the time of the Act's passage, assume the status of manuscripts awaiting their "first publication," at which time only does a copyright term of 75 years begin. Should First Church remain content to publish only the 1906 edition of the text it currently publishes, it would hold copyrights in, and thus publication control over, all other variant editions, whose publication it could suppress indefinitely.

**23.** Complaint, *United Christian Scientists v. Christian Science Bd. of Directors,* Civ. No. 83–3486 (D.D.C.) (filed Nov. 18, 1983), R. 1.

**24.** *United Christian Scientists v. Christian Science Bd. of Directors, supra* note 3, 616 F.Supp. at 476 n. 1. We see no problem at this point arising from 28 U.S.C. § 2403(a) (1982), which calls upon a federal court to certify to the Attorney General the pendency of private-party litigation implicating the constitutionality of an Act of Congress affecting the public interest, and confers upon the Government the right to intervene for presentation of evidence and argument on the question of constitutionality. This provision had no bearing on the instant case as originally brought, for the Register of Copyrights—an "officer" of the United States—was the sole defendant. Even assuming that § 2403(a) came into play when First Church was substituted—a question we do not decide— we note that copies of the complaint and sum-

tion of First Church to dismiss for lack of subject-matter jurisdiction,[25] and, on cross-

mons were served on the Attorney General as well as on the United States Attorney, Affidavit of Service, *United Christian Scientists v. Christian Science Bd. of Directors,* Civ. No. 83–3486 (D.D.C.) (filed Dec. 12, 1983) at 1–2, R. 2, when the action was initiated as one against the Register alone; and that, at a later date, the Attorney General himself was joined as an additional defendant, see Amended Complaint ¶ 3 (filed May 1, 1984), R. 6, but on the Government's motion was dismissed along with the Register, Order (filed June 14, 1984), after Government counsel represented unqualifiedly to the District Court that both officers were prepared to accept the court's judgment with respect to the validity of Private Law 92–60. Transcript (Tr.) 3–5, R.E. 57–59 (June 14, 1984). It thus is clear that the Attorney General has known about this case from the very beginning, and that the purpose of § 2403(a) has been well served.

**25.** *United Christian Scientists v. Christian Science Bd. of Directors,* Civ. No. 83–3486 (D.D.C. Oct. 19, 1984) (order). By this motion, First Church contended that no case or controversy was presented, that United Christian Scientists lacked standing, and that the case was not ripe for disposition. Motion of Mother Church to Dismiss, *United Christian Scientists v. Christian Science Bd. of Directors,* Civ. No. 83–3486 (D.D.C.) (filed July 12, 1984) at 1, R. 27. First Church renews these arguments on appeal, Brief for Appellant at 37–45, but we find none of them persuasive.

The Declaratory Judgment Act authorizes federal courts to award declaratory relief only in circumstances presenting an "actual controversy" for decision. 28 U.S.C. § 2201 (1982). This requirement reflects the correct understanding that the federal judicial power is limited to "cases" or "controversies" in the constitutional sense. *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–240, 57 S.Ct. 461, 463, 81 L.Ed. 617, 621 (1937). Patent cases brought under the Declaratory Judgment Act yield a two-part standard for determining whether, as a threshold matter, a justiciable controversy is presented therein. See 6A J. Moore, J. Lucas & G. Grotheer, Jr., *Moore's Federal Practice* ¶ 57.20, at 227 (2d ed. 1986); 10A C. Wright, A. Miller & M. Kane, *Federal Practice* § 2761, at 669 (2d ed. 1983) (assimilating patent and copyright questions). The "actual controversy" requirement "is satisfied when a defendant's conduct has 'created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question,' and when the plaintiff has 'actually produced the accused device' or has 'prepared to produce such a device.'" *Indium Corp. of Am. v. Semi-Alloys, Inc.,* 781 F.2d 879, 883 (Fed.Cir.1985) (quoting *Jervis B. Webb Co. v. Southern Sys. Inc.,* 742 F.2d 1388, 1398–1399 (Fed.Cir.1984)), *cert. denied,* — U.S. —, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986); see *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.,*

motions for summary judgment, held Private Law 92–60 in contravention of the

439 F.2d 871, 874 (1st Cir.1971); *Super Prods. v. D P Way Corp.,* 546 F.2d 748, 753 (7th Cir.1976); *Sherwood Medical Indus., Inc. v. Deknatal, Inc.,* 512 F.2d 724, 727 (8th Cir.1975).

To warrant a finding of actual controversy, the declaratory defendant need not actually charge infringement; rather, the threat may be implicit in his conduct or representations. *Super Prods. v. D P Way Corp., supra,* 546 F.2d at 753. The plaintiff, however, must establish that his apprehension of infringement charges is reasonable and objectively manifested in light of the totality of the circumstances. *Sherwood Medical Indus., Inc. v. Deknatal, Inc., supra,* 512 F.2d at 728. If he does so, and shows further that he has the present intention and ability to engage in the putatively infringing conduct, he has demonstrated a personal stake in the controversy entitling him to seek declaratory relief. *Super Prods. Corp. v. D P Way Corp., supra,* 546 F.2d at 753 (citing *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947, 962 (1968)).

The record in this case reveals an actual controversy entitling United Christian Scientists to seek declaratory relief. It is not disputed by the parties that its planned publications involve materials purportedly protected by the copyright that Private Law 92–60 bestows upon First Church. Viewed as a whole, the Church's conduct and representations fairly support objectively an apprehension that should United Christian Scientists disseminate *Science and Health* in the proposed edition and formats to subscribers of "Hear Ye the Glad Sound?"—a project it has the present intention and means to effectuate—an infringement action may well follow. *See* text *supra* at notes 14–18 and note 18 *supra.* The circumstances to which Nolan attests present a constellation of factors which courts have regularly recognized as buttressing a reasonable apprehension of impending litigation: a prior record of infringement charges against the declaratory plaintiff or others similarly situated, evincing the defendant's willingness to enforce his rights, see *C.R. Bard, Inc. v. Schwartz,* 716 F.2d 874, 881 (Fed.Cir.1983); *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., supra,* 439 F.2d at 874; *Sherwood Medical Indus., Inc. v. Deknatal, Inc., supra,* 512 R.2d at 728; see also *International Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1212 (7th Cir.1980); putatively benign representations on the part of the declaratory defendant from which an implied threat may be discerned, *C.R. Bard, Inc. v. Schwartz, supra,* 716 F.2d at 881; *Super Prods. Corp. v. D P Way Corp., supra,* 546 F.2d at 753; and the defendant's failure to disavow interest in charging the undertaking in question, *C.R. Bard, Inc. v. Schwartz, supra,* 716 F.2d at 881; *Sherwood Medical Indus., Inc. v. Deknatal, supra,* 572 F.2d at 728–729. Every "assurance" of nonenforcement that First Church has offered United Christian Scientists is pointedly conditional in terms, see note 18 *supra;* Rathbun Affidavit,

Establishment Clause of the First Amendment.[26] This appeal followed.

## II

Normally, a grant of a copyright on a religious work poses no constitutional difficulty. Religious works are eligible for protection under general copyright laws, and for decades *Science and Health* was unproblematically the beneficiary of that security, as more than thirty editions and

translations of the Bible currently are.[27] By contrast, Private Law 92–60 confers upon a religious body an unusual measure of copyright protection by unusual means, and in a fashion that interjects the federal government into internal church disputes over the authenticity of religious texts. But for Private Law 92–60, *Science and Health* would now be in the public domain,[28] and because of the copyright conferred by Private Law 92–60, dissident Christian Scientists must defer, now and in

*supra* note 10, at 2, 3, 4, R.E. 65, 66, 67 (requiring "faithful" reproduction of text); and the latter has the present intention and ability to disseminate *Science and Health* to subscribers of "Hear Ye the Glad Sound?", and would do so but for the threat of an infringement action by First Church. Nolan Affidavit in Opposition, *supra* note 10, at 4–7, R.E. 103–106. In view of the reasonableness of the apprehension asserted and its inhibiting effect on matters of speech and religious exercise, we deem an actual controversy presented which United Christian Scientists and its co-appellees have standing to litigate.

That there is such standing is equally discernible by application of traditional principles to the record before us. The plaintiff, of course, must allege a personal stake in the outcome of the controversy sufficient to assure that concrete adverseness which sharpens presentation of the issues is present, *Larson v. Valente*, 456 U.S. 228, 238–239, 102 S.Ct. 1673, 1680, 72 L.Ed.2d 33, 44 (1982), and demonstrate further that he personally has "suffered some actual or threatened injury" that "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700, 709 (1982) (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66, 76 (1979) and *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450, 460 (1976)) (footnote omitted). Appellee Nolan is chairman and Lucile Place is a trustee of United Christian Scientists, an organization of Christian Scientists founded to disseminate widely the teachings of Mary Baker Eddy, and currently seeking to publish her major work, *Science and Health*. Nolan Affidavit, *supra* note 5, 1–7, R.E. 9–15; Amended Complaint ¶¶ 4–6, 22, *United Christian Scientists v. Christian Scientist Bd. of Directors*, Civ. No. 83–3486 (D.D.C.) (filed May 1, 1984), R.E. 41, 46. Both the organization and these officers clearly have the requisite "personal stake" in the outcome of this controversy. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214, 229 (1982); *American Legal Found. v. FCC*, 257 U.S.App.D.C. 189, 197, 808 F.2d 84, 92 (1987)

(organization must allege "discrete programmatic concerns ... directly and adversely affected by the defendant's actions") (citing *Action Alliance of Senior Citizens v. Heckler*, 252 U.S.App. D.C. 249, 255, 789 F.2d 931, 937 (1986)). Nolan avers that the organization is able and ready to disseminate *Science and Health*, and would do so but for the threat of an infringement suit by First Church. Nolan Affidavit in Opposition, *supra* note 10, at 4–7, R.E. 103–106. An award to United Christian Scientists of the declaratory judgment of unconstitutionality it seeks would invalidate First Church's copyright, and return *Science and Health* to the public domain, enabling the organization to publish without fear of reprisal. As our analysis of the "actual controversy" component of justiciability of declaratory judgment actions has established, we have before us "a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826, 829 (1941). For an elaboration of our determination that the controversy is ripe for disposition, see note 29 *infra*.

26. *United Christian Scientists v. Christian Science Bd. of Directors*, *supra* note 3, 616 F.Supp. at 481.

27. See Affidavit of Steven B. Rotman, *United Christian Scientists v. Christian Science Bd. of Directors*, Civ. No. 83–3486 (D.D.C.) (filed Jan. 18, 1985) at 4–5, R.E. 158–159.

28. Copyrights on all editions except that of 1906 had lapsed when Private Law 92–60 was enacted. At that time, the 1906 edition along with other works, was eligible for year-to-year copyright extensions made available by Congress pending revision of the copyright laws. It remained so until 1976, when general copyright legislation established a term enduring for the lifetime of the author plus 50 years for newly-copyrighted works, see 17 U.S.C. § 302(a) (1982), and provided that copyrights extended under the yearly acts would not expire until 75 years after the date the copyright was originally obtained, *id.* § 304(b). Thus, under the 1976

the foreseeable future, to the will of First Church, under whose exclusive control Congress has placed all decisions respecting publication and dissemination of *Science and Health.*

On its face, such an extraordinary grant of power to a religious entity arouses Establishment Clause concerns.[29] The First Amendment's proscription on establishment of religion does not demand total

general legislation, the copyright on the 1906 edition of *Science and Health* would have expired in 1981. See *United Christian Scientists v. Christian Science Bd. of Directors, supra* note 3, 616 F.Supp. at 477 n. 2. Private Law 92–60, however, not only extended the copyright on that edition 65 years longer, but also retrieved all other editions of *Science and Health,* previously-copyrighted and uncopyrighted, from the public domain and placed them under copyright as well. See text *supra* at notes 20–22.

**29.** First Church contends that this case is not ripe for judicial resolution. Brief for Appellant at 44–45. To the contrary, we find the issues presented clearly fit for decision and the hardship to United Christian Scientists from deferral considerable. See *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967).

United Christian Scientists seeks a declaratory judgment that the statute vesting First Church with a copyright in *Science and Health* is facially unconstitutional, under the Establishment Clause. Adjudication of the claim requires first that we scrutinize the purposes animating Private Law 92–60. See Part II(A) *infra.* The Supreme Court has recently emphasized that only such evidence as "illustrate[s] the contemporaneous purpose of the ... legislature when it made the law," *Edwards v. Aguillard,* — U.S. —, —, 107 S.Ct. 2573, 2584, 96 L.Ed.2d 510, 527 (1987) (footnote omitted), is relevant to the Establishment Clause inquiry. The legislative record on congressional purpose is readily available, and it requires no further development. See *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 149, 87 S.Ct. at 1516, 18 L.Ed.2d at 692 (questions "purely of congressional intent" indicate fitness of record for resolution).

To the extent that we consider, as an alternate ground for our decision, the effect of the challenged legislation, see Part II(B) *infra,* we deem the record equally adequate. The Government has expressed no present interest in Private Law 92–60, Tr. at 3–4, 18 (Apr. 17, 1984), R.E. 22–25, 37, and had indicated that it will be bound by any decision reached in this case, Tr. 3–6 (June 14, 1984), R.E. 57–60. Thus we need not await an authoritative interpretation of the law by a coordinate branch of government, or examine instances of its actual enforcement—factors otherwise counseling restraint. See *Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 163–164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697, 701–702 (1967); *National Conference of Catholic Bishops v. Smith,* 209 U.S.App.D.C. 280, 288, 653 F.2d 535, 543 (1981). Indeed, unlike Establishment Clause attacks on subsidy or tax programs where an examination of administrative interpretation and enforcement may be critical to

the inquiry into primary effect, our task here is relatively straightforward: to assess the symbolic and practical benefits Private Law 92–60 grants First Church—matters discernible from the law itself and its legislative history. Clearly, the constitutionality of the law is in no measure dependent upon the matter in which First Church chooses to exercise the powers Private Law 92–60 confers upon it, but instead it must be gauged by their nature and scope.

On the other aspect of the balance, we see considerable hardship to United Christian Scientists and its members from a deferral of decision. That group has properly applied for such "relief [as] one potentially liable for infringement[,] to allow him to know in advance whether he may legally pursue a particular course of conduct." *Hanes Corp. v. Millard,* 174 U.S.App. D.C. 253, 260, 531 F.2d 585, 592 (1976). As we have recognized, "[t]he courts have ... been especially generous in granting [declaratory] relief to the alleged infringer, anxious, in Learned Hand's much quoted phrase, that an invalid or overbroad patent claim not 'remain in the art as a scarecrow.'" *Id.* (quoting *Besnick v. United States Vitamin Corp.,* 139 F.2d 239, 242 (2d Cir.1943)). This concern is especially pressing here in view of the fact that the activity inhibited involves not merely business but also speech and religious exercise. See *Martin Tractor Co. v. Federal Election Comm'n,* 200 U.S.App. D.C. 322, 327, 627 F.2d 375, 380, *cert. denied,* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980); cf. *Meltzer v. Board of Pub. Instruction,* 548 F.2d 559, 572–573 (5th Cir.1977) (where statute requiring teaching of "Christian virtue" was not presently enforced against noncomplying teachers, it would nonethless have impact on classroom instruction of schoolchildren; controversy of sufficient immediacy and reality to warrant issuance of declaratory judgment), *aff'd in relevant part,* 577 F.2d 311 (5th Cir. *en banc* 1978), *cert. denied,* 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); see generally *Toilet Goods Ass'n, Inc., v. Gardner, supra,* 387 U.S. at 164, 87 S.Ct. at 1524, 18 L.Ed.2d at 702 (impact of challenged action "felt immediately by those subject to it in conducting their day-to-day affairs"); *International Union, United Auto., etc. Workers v. Brock,* 251 U.S.App.D.C. 239, 252, 783 F.2d 237, 250 (1986) (same). An apprehension of infringement charges has already deterred United Christian Scientists from proceeding with its publication plans, and it should not be forced to shoulder the burden of producing and disseminating, at considerable expense, the contemplated recordings of *Science and Health* in order to assert the invalidity of First Church's copyright in defense to infringement charges.

separation of church and state.[30] It does require, however, unflagging vigilance to ensure that affairs of state do not become entangled with those of religion. As the Supreme Court has declared,

> [t]he First Amendment's guarantee that "Congress shall make no law respecting an establishment of religion," ... is more than a pledge that no single religion will be designated as a state religion.... It is also more than a mere injunction that governmental programs discriminating among religions are unconstitutional.... The Establishment Clause instead primarily proscribes "sponsorship, financial support, and active involvement of the sovereign in religious activity" .... "Neither [a state nor the Federal Government] can pass laws which aid one religion, aid all religions or prefer one religion over another."[31]

■ The touchstone for evaluating church-state relations under the Establishment Clause is the test enunciated by the Supreme Court in *Lemon v. Kurtzman.*[32] There the Court identified three distinct criteria for determining the constitutionality of legislation under the Establishment Clause:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; and finally, the statute must not foster "an excessive government entanglement with religion."[33]

Failure of a statute to satisfy any one of these criteria requires its invalidation.[34] Justice O'Connor has supplied an exposition of the first two prongs of the *Lemon* standard which, the Court has suggested,[35] may appropriately focus application of the test:

> The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid.[36]

We thus approach the inquiry mandated by *Lemon* with heightened sensitivity to a commitment, long a part of our constitutional tradition and recently reaffirmed by the Supreme Court, that government cannot exert its authority in the domain of religious conviction. Government may not convey any message of "endorsement or

---

*Hanes Corp. v. Millard, supra,* 174 U.S.App.D.C. at 260, 531 F.2d at 592. In these circumstances, we deem the request for declaratory relief ripe for adjudication.

**30.** E.g., *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745, 756 (1971).

**31.** *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 381, 105 S.Ct. 3216, 3221–3222, 87 L.Ed.2d 267, 275 (1985) (quoting *Committee for Pub. Educ. v. Nyquist,* 413 U.S. 756, 772, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948, 962–63 (1973) (quoting *Everson v. Board of Educ.,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711, 723 (1947)).

**32.** *Supra* note 30. Though the preeminence of the *Lemon* inquiry was questioned in *Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604, 613–614 (1984), the Court nevertheless relied upon it, *id.* at 680–685, 104 S.Ct. at 1362–1365, 79 L.Ed.2d at 614–617, and since *Lynch* the Court has explicitly affirmed the continuing vitality of the *Lemon* test. See *Edwards v. Aguillard, supra* note 29, —— U.S. at —— & n. 4, 107 S.Ct. at 2577 & n. 4, 96 L.Ed.2d at 518–519 & n. 4; *Wallace v. Jaffree,* 472 U.S. 38, 55,

105 S.Ct. 2479, 2489, 86 L.Ed.2d 29, 42–43 (1985); see also *Grand Rapids School Dist. v. Ball, supra* note 31, 473 U.S. at 382–383, 105 S.Ct. at 3222, 87 L.Ed.2d at 276–277.

**33.** *Lemon v. Kurtzman, supra* note 30, 403 U.S. at 612–613, 91 S.Ct. at 211, 29 L.Ed.2d at 755 (quoting *Walz v. Tax Comm'n,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697, 704 (1970)).

**34.** *Edwards v. Aguillard, supra* note 29, —— U.S. at ——, 107 S.Ct. at 2577, 96 L.Ed.2d at 518–519; *Stone v. Graham,* 449 U.S. 39, 40–41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199, 202 (1980).

**35.** See *Edwards v. Aguillard, supra* note 29, —— U.S. at ——, 107 S.Ct. at 2578, 96 L.Ed.2d at 520 (purpose); *Grand Rapids School Dist. v. Ball, supra* note 31, 473 U.S. at 389, 105 S.Ct. at 3226, 87 L.Ed.2d at 281 (effect); *Wallace v. Jaffree, supra* note 32, 472 U.S. at 56, 105 S.Ct. at 2490, 86 L.Ed.2d at 43 (purpose).

**36.** *Lynch v. Donnelly, supra* note 32, 465 U.S. at 690, 104 S.Ct. at 1368, 79 L.Ed.2d at 621 (concurring opinion).

disapproval"[37] of religious activity, or use its "power [or] prestige ... to control, support or influence"[38] any matter of religious faith.

### A.

Over the past several terms, the Supreme Court has devoted considerable attention to the inquiry into statutory purpose mandated by *Lemon*. In *Lynch v. Donnelly*,[39] a plurality of the Court suggested that "a secular purpose ... is all that *Lemon* ... requires,"[40] but a majority of the *Lynch* Court was unwilling to adopt that weakened formulation of the test. Observing that the secular-purpose requirement "is not satisfied ... by the mere existence of some secular purpose, however dominated by religious purpose,"[41] Justice O'Connor, a member of the majority, joined with four dissenting justices in calling for a more rigorous standard.[42] Subsequently, in *Wallace v. Jaffree*,[43] the Court returned to the question, and while

it acknowleded that "a statute . . . motivated in part by a religious purpose may satisfy the first criterion,"[44] it declared unequivocally that "no consideration of the second or third [*Lemon*] criteria is necessary if a statute does not have a clearly secular purpose."[45] Last term, in *Edwards v. Aguillard*,[46] the Court forcefully reaffirmed this understanding, insisting that only laws manifesting a "clear secular purpose" could survive Establishment Clause scrutiny.[47] Of course, it is a commonplace that "the First Amendment requires that a statute . . . be invalidated if it is entirely motivated by a purpose to advance religion."[48]

We thus are presented with the task of determining whether any of the purposes advanced by Congress in enacting Private Law 92–60 is "clearly secular." Where, as here, government has bestowed a significant benefit upon a single religious denomination, we embark on this mission with special care.[49] Our examination of the leg-

---

**37.** *Id.*

**38.** *Engle v. Vitale*, 370 U.S. 421, 429, 82 S.Ct. 1261, 1266, 8 L.Ed.2d 601, 607 (1962).

**39.** *Supra* note 32.

**40.** 465 U.S. at 681 n. 6, 104 S.Ct. at 1363 n. 6, 79 L.Ed.2d at 615 n. 6.

**41.** *Id.* at 691, 104 S.Ct. at 1368, 79 L.Ed.2d at 621 (concurring opinion).

**42.** See *id.* at 698–701, 104 S.Ct. at 1372–1373, 79 L.Ed.2d at 626–628 (dissenting opinion) (practice unconstitutional as it does not serve a "clearly ... secular purpose").

**43.** *Supra* note 32.

**44.** 472 U.S. at 56, 105 S.Ct. at 2490, 86 L.Ed.2d at 43.

**45.** *Id.* (footnote omitted) (emphasis added).

**46.** *Supra* note 29.

**47.** —— U.S. at ——, —— n. 15, 107 S.Ct. at 2578, 2583 n. 15; 96 L.Ed.2d at 520, 526 n. 15 ("clear secular purpose"); *id.* at ——, 107 S.Ct. at 2583, 96 L.Ed.2d at 526 ("clear secular intent").

**48.** *Wallace v. Jaffree, supra* note 32, 472 U.S. at 56, 105 S.Ct. at 2490, 86 L.Ed.2d at 43.

**49.** We are mindful of the teaching of *Larson v. Valente, supra* note 25, where the Court stated

that "when we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." 456 U.S. at 246, 102 S.Ct. at 1684, 72 L.Ed.2d at 49. *Larson* involved a statute that facially discriminated among religions. See *id.* at 246 n. 23, 102 S.Ct. at 1684 n. 23, 72 L.Ed.2d at 49 n. 23. The Court utilized a test of strict scrutiny in determining its constitutionality, characterizing the *Lemon* test, as "intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions like [the state law in question] that discriminate *among* religions." *Id.* at 252, 102 S.Ct. at 1687, 72 L.Ed.2d at 52–53 (emphasis in original).

We doubt that Private Law 92–60 could survive *Larson*'s standard of strict scrutiny, since it singles out one religious denomination as the recipient of an unusual religious benefit, but we do not invalidate the law on that account. The Court has never returned to elaborate upon the doctrinal development it announced in *Larson*. Moreover, it has been suggested that the *Larson* test may be assimilated to the *Lemon* standard. See *Lynch v. Donnelly, supra* note 32, 465 U.S. at 688 n. *, 104 S.Ct. at 1366 n. *, 79 L.Ed.2d at 619 n. * (concurring opinion). Finally, *Larson*'s application to the case at bar was neither considered by the District Court, nor argued before us. Thus, we proceed by applying the *Lemon* test, relying upon *Larson*'s authority to the extent that we conduct *Lemon*'s inquiry into legislative purpose with special care.

islative history of Private Law 92–60 discloses no clearly secular purpose for the grant of this extraordinary copyright privilege. Instead, we find the legislative record fraught with expressions of an intent to assist achievement of a religious goal.

We preface our review of the legislative history of Public Law 92–60 by examining the testimony of those for whose special relief Congress enacted it.[50] Church witnesses testifying on behalf of the legislation explained pointedly that their purpose in seeking copyright protection for *Science and Health* was to maintain its doctrinal purity. Dr. J. Buroughs Stokes, manager of the Christian Science Committees on Publication, urged a subcommittee of the House Committee on the Judiciary to grant the copyright extension for *Science and Health* by emphasizing the great importance that Christian Scientists may attach to even slight variations in a religious text:

> Changes of wording ... are extremely important to members of our church. To others they may seem minor, but, as those of you know who are familiar with matters religious, centuries in the Christian church were devoted to clarifying just such questions of wording. Words, of course, stand for religious positions of vast significance in the lives of thousands of believers.[51]

Church control over publication of *Science and Health* was thus crucial, he said, because members seeking to read the work "should be able to get the book they are thinking they are buying and not some other version which is not the ordained pastor of the Christian Science church."[52] To a suggestion that a religious text ought to receive no more protection than a secular text, the witness replied, "Mr. Congressman, we are dealing with powers greater than the commercial interest.... We have got to protect religion, we have got to protect what God wants his children to hear."[53] Another witness, Church counsel John Peterson, when pressed during a similar colloquy with committee members on whether a private copyright would inhibit dissident church members from publishing editions of *Science and Health* other than the one favored by the Church, responded:

> I would say really that the founder of a religion has a right to have her teachings set forth in the way she wanted to set them forth. If someone should take an early edition and try to publish that and say this is different and so on, they are, in substance, passing themselves off as followers of hers when that isn't what she taught.[54]

This witness also stated:

> I think the courts in the doctrines of unfair competition would actually prevent that because there would be such a misleading of the public when they ask for the book "Science and Health" if they got an earlier edition instead of the cur-

50. As the Supreme Court made clear in *Edwards v. Aguillard, supra* note 29, the inquiry into legislative purpose mandated by *Lemon* is broad-ranging. See ― U.S. at ―, 107 S.Ct. at 2583, 96 L.Ed.2d at 526. Courts embarking upon this task may examine the testimony not only of legislative sponsors, but also that of key witnesses, and of experts who "participated in or contributed to the enactment of the law or its implementation." *Id.* at ―, 107 S.Ct. at 2584, 96 L.Ed.2d at 527 (footnote omitted). Similarly, courts may look beyond formal legislative sources to the general historical context of the statute, including the sequence of events leading to its passage. *Id.* at ―, 107 S.Ct. at 2583, 96 L.Ed.2d at 526; *Epperson v. Arkansas,* 393 U.S. 97, 107–109, 89 S.Ct. 266, 272–273, 21 L.Ed.2d 228, 236–237 (1968); see also *id.* at 108 n. 16, 89 S.Ct. at 272 n. 16, 21 L.Ed.2d at 236 n. 16 (examining advertising campaign used to secure statute's passage). The object of the inquiry is to ascertain "the contemporaneous purpose of the ... legislature when it made the law," *Edwards v. Aguillard, supra* note 29, ― U.S. at ―, 107 S.Ct. at 2584, 96 L.Ed.2d at 527, and all sources illuminative of that purpose may properly be consulted by a court undertaking *Lemon's* inquiry.

51. *For the Relief of Clayton Bion Craig, Arthur P. Wuth, Mrs. Lenore D. Hanks, David E. Sleeper, And DeWitt John: Hearings on S. 1866 Before Subcomm. No. 3 of the House Comm. on the Judiciary,* 92d Cong., 1st Sess. 8–9 (1971) [hereinafter *Hearings* ].

52. *Id.* at 21.

53. *Id.* at 22.

54. *Id.* at 20.

rent edition, that they would be misled and the courts generally have shown themselves very jealous of the right of the public to get what they ask for.[55]

Church witnesses identified themselves as guardians of the doctrinal purity of *Science and Health,* and beseeched Congress to lend assistance in preserving their authority in this role. As the District Court aptly observed, "[s]uch proceedings have the sound of the 17th century to them. They are resonant of what might have occurred before the Committee on Religion of the last Parliament to sit before the English Revolution, but they are discordant in the context of contemporary American debate." [56]

We do not, of course, rest on witness testimony in adjudging the constitutionality of Private Law 92–60. We turn now to the legislative objectives formally announced by Congress in passing this law, and we find none that is clearly secular. Senator Burdick, the sponsor of the private bill in the Senate, urged its passage with the following exhortation:

> If the copyright of Science and Health with Key to the Scriptures should ever be permitted to expire, the book would fall into the public domain. Amended editions, annotated versions, modernized editions, and abridged editions could all be published and would cause great distress and confusion, not only among Christian Scientists, but among those of the general public wishing to obtain a correct and complete statement of the teachings of this religion.... Most copyrights are granted in order to give their owners a temporary monopoly over a specific expression of an idea to permit persons to obtain a reasonable monetary profit from artistic or literary effort. In cases where that is the rationale for granting copyright there is no justification for continuing copyright beyond its normal term, particularly by the use of a private bill. In the case of this particular

literary work, however, the underlying rationale for its copyright is different. It is in the nature of protection against unfair competition or confusion in the mind of the public rather than the protection of an economic interest.[57]

Even more importantly, the statement of purpose set forth in the Senate Report, and incorporated verbatim into the House Report, states in similar vein:

> Those who are students or adherents of the Christian Science Religion ... look to the Bible and "Science and Health with Key to the Scriptures" as the only Pastor of this Church. All sermons in the Church of Christ Scientist, including the Mother Church in Boston and its branches in the United States and other countries, are comprised of readings of scriptural texts and correlative passages from "Science and Health." The citations comprising each weekly sermon are printed in the "Christian Science Quarterly," and each week the same sermon is read in every Church of Christ, Scientist, throughout the world.

> \*      \*      \*      \*      \*      \*

> In all of the religious practices and activities of Christian Science, use of "Science and Health with Key to the Scriptures" as a textbook is based in two essential factors. First, the text of the book must be authentic and contain the exact words of its author, Mary Baker Eddy. Second, the words on each page, together with the numbering of the pages and lines, must be the same in all editions and translations and be consistent with the system of reference and citation established by Mary Baker Eddy. Unless the book meets these requirements it cannot serve its purpose as the denominational textbook of Christian Science. Accordingly, students and adherents of this religion must use "Science and Health with Key to the Scriptures"

---

55. *Id.* at 19.

56. *United Christian Scientists v. Christian Science Bd. of Directors, supra* note 3, 616 F.Supp. at 480.

57. 117 Cong.Rec. 26,822 (1971) (statement of Sen. Burdick).

without any change in the words or form.

\*   \*   \*   \*   \*   \*

The purpose of seeking copyright for this book is not to provide pecuniary profit or material gain for the Trustees or the Church, but to preserve and maintain the purity and integrity of the statement of the religious teachings of this denomination, and thereby to protect members of the public against the possibility that, in purchasing or otherwise acquiring the book entitled "Science and Health with Key to the Scriptures," they might receive a distorted version of the teachings of Christian Science instead of the true and correct version thereof, or that the version acquired might not be the book which they require for the study and practice of Christian Science.[58]

As these excerpts from the legislative history plainly attest, Congress enacted Private Law 92–60 in response to what it perceived to be the unique needs of Christian Science. Three themes emerge clearly. First, as the committee reports reveal, Congress was aware of the status of *Science and Health* as "pastor" to Christian Scientists,[59] and of the key role played by this text in weekly church sermons. In granting extended copyright protection to *Science and Health*, Congress concentrated not only on the great significance of the textual language, but also on the Church's need for standardized pagination and lineation, and its desire to control the publication format so that all editions might serve as the church's pastor. Congress also appreciated fully the centrality of *Science and Health* as a statement of Christian Science faith and an integral part of Christian Science worship. It sought to aid First

Church in its effort "to preserve and maintain the purity and integrity of the statement of the religious teachings of this denomination,"[60] and to maintain control over all publication decisions concerning *Science and Health*, inclusive of the right to choose which of the many editions of the text would be made generally accessible. And Congress understood the peculiar nature of the copyright protection it awarded to First Church. It distinguished the objectives of this grant from those normally associated with copyrights, asserting that its purpose was not to secure pecuniary advantage for the Church, but to prevent "confusion in the mind of the public"[61]—at least that segment endeavoring to inform itself about *Science and Health* as taught by the Church.

None of the concerns proffered in justification for enactment of this law can accurately be characterized as "clearly secular." Our constitutional tradition unequivocally indicts them all as impermissible objects of government. It is not the function of government to promote religious worship, to enable a religious entity to control statements of church doctrine, or to guide a "confused" public to "correct" religious authority. In wielding its power on behalf of the religious interests of First Church, Congress overlooked "the belief that a union of government and religion tends to destroy government and to degrade religion,"[62] and that "the core rationale underlying the Establishment Clause is preventing 'a fusion of governmental and religious functions.'"[63]

In extending an exceptional kind of copyright protection to *Science and Health* to ensure that all versions will conform to the perceptions of First Church, Congress also

---

**58.** Senate Rep., *supra* note 5, at 2; H.R.Rep. No. 604, 92d Cong., 1st Sess. 3 (1971) [hereinafter House Rep.].

**59.** See Senate Rep., *supra* note 5, at 2; 117 Cong.Rec. 26,822 (1971) (statement of Sen. Burdick) ("Christian Science Church has no ordained clergy, and adherents of this religion look to ... the Christian Science textbook for instruction in their religion ...").

**60.** Senate Rep., *supra* note 5, at 2.

**61.** 117 Cong.Rec. 26,822 (1971) (statement of Sen. Burdick).

**62.** *Engel v. Vitale, supra* note 38, 370 U.S. at 431, 82 S.Ct. at 1267, 8 L.Ed.2d at 608.

**63.** *Larkin v. Grendel's Den,* 459 U.S. 116, 126, 103 S.Ct. 505, 512, 74 L.Ed.2d 297, 307 (1982) (quoting *Abington School Dist. v. Schempp,* 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844, 858 (1963)).

lost sight of the Supreme Court's teaching that government may not place "its official stamp of approval upon one particular kind of prayer or one particular form of religious services."[64] Rather, as the Court has made plain, "government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance."[65] Though *Science and Health* is the pastor to Christian Scientists, it is not the office of Congress to grant continual, if indeed not perpetual, dominion over the text to First Church in order that it may serve that end. It is for First Church, not Congress, to identify and maintain an authoritative version of *Science and Health,* one with pagination and lineation suitable for the Church's Sunday services. When Congress departs from generalized copyright legislation and enacts special copyright protection for a religious entity in order to enhance its sway over the manner of religious worship, it has engaged in "sanctioning official prayers," a quintessential act of establishment.

■ Congress may surely recognize the vitality and diversity of religion in American life, but it may not exceed the bounds of benevolent neutrality toward religion and religious practice.[66] In providing a special copyright removing *Science and Health* from the public domain and placing it exclusively in the grip of First Church, Congress did more than acknowledge, or even accommodate, the religious practices of orthodox Christian Scientists. It lent the Church leadership the assistance vital to shaping the beliefs of lay worshipers and thereby involved itself in the task of inculcating religion.[67]

64. *Engel v. Vitale, supra* note 38, 370 U.S. at 429, 82 S.Ct. at 1266, 8 L.Ed.2d at 607.

65. *Id.* at 435, 82 S.Ct. at 1269, 8 L.Ed.2d at 610.

66. See *Stone v. Graham, supra* note 34, where the Court struck down a state law relating to posting the Ten Commandments in public school classrooms as devoid of secular purpose:

> If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause.

449 U.S. at 42, 101 S.Ct. at 194, 66 L.Ed.2d at 202 (citations omitted).

67. First Church regards Private Law 92–60 as a statute designed to promote free exercise of religion. Brief for Appellant at 21–22. Others do as well. See 117 Cong.Rec. 26,822 (1971) (statement of Sen. Burdick) ("absolutely essential to the free practice ... of religious beliefs" that Christian Scientists obtain copies of *Science and Health* exactly as copyrighted by author). We cannot accept this characterization of Private Law 92–60 because it claims for "free exercise" a meaning fundamentally at odds with past precedent.

Government is permitted, and at times required, to accommodate religious practice when *government itself,* directly or indirectly, places a burden on religious exercise. See, e.g., *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (compulsory education laws); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (unemployment compensation statute). But the First Amendment directs that Congress "shall make no law ... prohibiting ... free exercise ...," and in this instance there was no governmentally-imposed burden to justify enactment of this special copyright legislation. Instead, First Church sought and Congress provided an advantage in the copyright it granted First Church, one available to no others, religious or secular. In so doing, Congress promoted the interests of First Church over and against those of other parties interested in *Science and Health,* among them dissident Christian Scientists such as appellees, and the community of historians who resort to that work. Indeed, from this vantage point, the congressional action may perhaps more plausibly be characterized as abridging the free exercise of religion. But see note 104 *infra.*

We do not hold that government may never promote the values of free exercise by accommodating religious needs. What we do say is that governmental action may not escape scrutiny under the Establishment Clause simply by an invocation of free exercise values to justify a grant of special benefits to a religious denomination when no governmental constraint on sectarian practice warrants the intervention. Indeed, when faced with a statute which, like Private Law 92–60, purported to accommodate religious practice but lifted no governmentally-imposed burden in doing so, the Supreme Court squarely held that the Establishment Clause was contravened. *Estate of Thorton v. Caldor,* 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) (statute requiring employers to honor employees' sabbath observance needs grants absolute preference to religion in violation of Establishment Clause). Similarly to Private Law 92–60,

■ If protection of the perceived needs of orthodox Christian Science worshipers fails to constitute a permissible secular purpose, the second-stated congressional objective in reviving and extending copyrights on *Science and Health*—"to preserve the purity and integrity of the statement of the religious teachings of this demomination" [68]—positively offends our constitutional tradition. "If there is any fixed star in our constitutional constellation," the Court has declared, "it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." [69] Consistently with this understanding, the Court has held that a state cannot prohibit the teaching of evolution simply because it is "deemed to conflict with a particular religious doctrine; that is, with a particular interpretation of the Book of Genesis by a particular religious group," [70] for "the First Amendment does not permit the State to require that teaching and learning ... be tailored to the principles or prohibitions of any religious sect or dogma." [71] Simply put, "the state has no legitimate interest in protecting any or all religions from views distasteful to

them. ...." [72] The Establishment Clause prohibits any and all official judgments concerning the rectitude of religious belief. "Government in our democracy, state and national," the Court has stated, "must be neutral in matters of religious theory, doctrine, and practice.... [I]t may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite." [73] For example, in adjudicating disputes over church property, the state is barred from resolving underlying controversies over church doctrine. [74] Similarly, the state may not make the truth or falsity of an individual's religious beliefs the subject of a criminal trial. [75]

■ Uniting these cases is the common understanding that the domain of religious conviction is pervaded by heterogeneity of viewpoint and continuing debate over religious truth. Government is therefore barred from assuming a position in the debate by attempting to establish religious truth by fiat. In matters of religion, truth, including purity of doctrinal statement, is left for the citizenry to determine by persuasion, not for resolution by exertion of governmental authority. [76] The congres-

---

the statute there at issue gave preference to some religions and religious practices over others, and to religious over secular interests.

**68.** Senate Rep., *supra* note 5, at 2; House Rep., *supra* note 58, at 3. See text *supra* at note 58.

**69.** *Board of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed.2d 1628, 1639 (1943).

**70.** *Epperson v. Arkansas, supra* note 50, 393 U.S. at 103, 89 S.Ct. at 270, 21 L.Ed.2d at 234.

**71.** *Id.* at 106, 89 S.Ct. at 271, 21 L.Ed.2d at 235.

**72.** *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 505, 72 S.Ct. 777, 782, 96 L.Ed. 1098, 1108 (1952) ("the state has no legitimate interest in protecting any or all religions from views distasteful to them which is sufficient to justify prior restraints upon the expression of those views. It is not the business of government in our nation to suppress real or imagined attacks on a particular religious doctrine ...").

**73.** *Epperson v. Arkansas, supra* note 50, 393 U.S. at 103–104, 89 S.Ct. at 270, 21 L.Ed.2d at 234.

**74.** *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian*

*Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969).

**75.** *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944).

**76.** This commitment was given forceful expression by the Court:

"The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." ... Freedom of thought, which includes freedom of religious belief ... embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of orthodox faiths.... The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state.

*United States v. Ballard, supra* note 75, 322 U.S. at 86–87, 64 S.Ct. at 886, 88 L.Ed. at 1153–54 (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679,

sional assumptions that extraordinary copyright protection for First Church was warranted by the need "to preserve and maintain the purity and integrity of the statement of the religious teachings of this denomination,"[77] in order to ensure that the public not "receive a distorted version of the teachings of Christian Science instead of the true and correct version thereof,"[78] flies in the face of this tradition and transgresses first principles of separation of church and state.

To the extent that protection of the public from confusion over the authentic version of *Science and Health* may be taken as an independent goal for the passage of Private Law 92–60, it stands equally indicted by the foregoing precedents. It is not the business of Congress to steer the public to a "correct and complete statement of the teachings of this religion"[79] any more than it is its business to provide such a statement itself. Extension of copyright security on *Science and Health* for the purpose of providing "protection against unfair competition or confusion in the mind of the public"[80] is tantamount to an endorsement of Christian Science doctrine as expounded by First Church. Indeed, by enacting Private Law 92–60, Congress did more than endorse the Church's current and future versions of the text. It also conveyed a correlative message of disapproval of all others. It also enabled First Church to stifle their publication, even though the Church well may have ample means at its disposal to notify the purchasing public of its approval of but one version, without resort to the machinery of government.[81] The grant of the Church's special copyright empowering it to "edify" the public by blocking access to variant, annotated, or abridged editions of *Science and Health* amounts to little more than a form of prior restraint.[82]

Lastly, denomination of the public as the beneficiary of this private copyright legislation does not, as First Church claims,[83] rescue it from the character of sectarian preference. Putting aside the question whether, in the universe of ideas, the public is ever served by outright paternalism, we note that only those segments of the public interested in reading solely the version of *Science and Health* sanctioned by the Church stand to benefit by the private copyright First Church has secured. More to the point, the congressional decision to provide "clarification" by way of the copyright means that everyone interested in *Science and Health,* for reasons religious or secular, may face difficulty in obtaining any version of that text except the one favored by the Church.[84]

728, 20 L.Ed. 666, 676 (1871)). And, the Court later declared,

[t]he place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the State is firmly committed to a position of neutrality. *Abington School Dist. v. Schempp, supra* note 63, 374 U.S. at 226, 83 S.Ct. at 1574, 10 L.Ed.2d at 860–861.

**77.** Senate Rep., *supra* note 5, at 2; House Rep., *supra* note 58, at 3. See text *supra* at note 58.

**78.** Senate Rep., *supra* note 5, at 2; House Rep., *supra* note 58, at 3. See text *supra* at note 58.

**79.** 117 Cong.Rec. 26,822 (1971) (statement of Sen. Burdick, sponsor of bill in Senate). See text *supra* at note 57.

**80.** 117 Cong.Rec. 26,822 (1971) (statement of Sen. Burdick, sponsor of bill in Senate). See text *supra* at note 57.

**81.** Cf. *Edwards v. Aguillard, supra* note 29, —— U.S. at ——, 107 S.Ct. at 2579, 96 L.Ed.2d at 521 (utility of alternative-means analysis in determining legislative purpose) ("[i]t is clear that requiring schools to teach creation science with evolution does not advance academic freedom. The Act does not grant teachers a flexibility that they did not already possess ..."); see also *Wallace v. Jaffree, supra* note 32, 472 U.S. at 59, 105 S.Ct. at 2491–2492, 86 L.Ed.2d at 45.

**82.** Cf. note 72 *supra.*

**83.** See Brief for Appellant at 6.

**84.** In addition to defending the foregoing purposes as secular, First Church argues that in passing the private copyright legislation Congress sought to effectuate the general aim of copyright law: to provide economic incentives that promote future literary, artistic and scien-

Having scrutinized the congressional purposes prompting enactment of Private Law 92–60, we find none to be clearly secular. We proceed to an examination of its operation to determine alternatively whether its effect is to advance religion.

### B.

The second prong of the *Lemon* test involves an inquiry as to whether a challenged act or practice has principally the effect of advancing or inhibiting religion.[85] This we investigate fully aware that a religious organization's enjoyment of merely "incidental" benefits does not implicate the proscription on "primary advancement" of religion.[86] In *Widmar v. Vincent*[87] the Court identified two factors it found "especially relevant" in identifying benefits which are " 'incidental' within the meaning of our cases."[88] The Court first looked to see whether the benefit "confer[red] any imprimatur of state approval on religious sects or practices."[89] It then ascertained whether the benefit conferred was "available to a broad class of nonreligious as well as religious" beneficiaries.[90] Applying these criteria, we conclude that the benefits reaped by First Church from Private Law 92–60 clearly do not qualify as incidental.

As the Supreme Court has observed, "the Establishment Clause does not prevent a State from extending the benefits of state laws to all citizens without regard for their religious affiliation."[91] It follows that "religious institutions need not be quarantined from public benefits that are neutrally available to all."[92] By this principle, First Church is eligible for copyright protection, which, like police and fire protection, is an "incidental benefit" available to a broad class of nonreligious as well as religious beneficiaries and carrying no particular imprimatur of governmental approval.[93]

The copyright Congress conferred upon First Church through Private Law 92–60 is, however, far from ordinary. Grants of copyright by private bill are rare; the committee reports identify only nine private copyright laws enacted by Congress since the founding of the Republic, none during this century and none for a religious organization on a religious text.[94] Moreover, the copyright granted by means of Private Law 92–60 is exceptional in scope and duration. Even if not construed as a copyright in perpetuity,[95] it purports to confer rights of unprecedented duration: the term of protection for the 1906 edition of *Science*

tific creativity. Brief for Appellant at xv. This account of the congressional purpose is implausible and contradicted by the record. A grant of copyright protection after the author's death to an entity not itself responsible for creating the work provides scant incentive for future creative endeavors. Moreover, Congress emphatically disavowed any purpose to afford to First Church the sort of economic incentives normally associated with copyright legislation. See text *supra* at notes 57–58.

85. See text *supra* at note 33.

86. *Widmar v. Vincent*, 454 U.S. 263, 273, 102 S.Ct. 269, 276, 70 L.Ed.2d 440, 450 (1981); see also *Committee for Pub. Educ. v. Nyquist, supra* note 31, 413 U.S. at 771, 93 S.Ct. at 2964, 37 L.Ed.2d at 962; *Roemer v. Maryland Pub. Works Bd.*, 426 U.S. 736, 745–747, 96 S.Ct. 2337, 2344–2345, 49 L.Ed.2d 179, 187–188 (1976) (concurring opinion).

87. *Supra* note 86.

88. 454 U.S. at 274, 102 S.Ct. at 276, 70 L.Ed.2d at 450.

89. *Id.*

90. *Id.* at 274, 102 S.Ct. at 277, 70 L.Ed.2d at 450.

91. *Board of Educ. v. Allen*, 392 U.S. 236, 242, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060, 1065 (1968).

92. *Roemer v. Maryland Pub. Works Bd., supra* note 86, 426 U.S. at 746, 96 S.Ct. at 2344, 49 L.Ed.2d at 187 (plurality opinion).

93. Cf. *id.* at 747, 96 S.Ct. at 2345, 49 L.Ed.2d at 188 (police and fire protection); *Zorach v. Clauson*, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed.2d 954, 961 (1951) (same).

94. Senate Rep., *supra* note 5, at 2–3; House Rep., *supra* note 58, at 3–4. Three of the nine relate to different editions of the same work. First Church cites numerous instances of private laws benefiting religious organizations, see Brief for Appellant at 9–10 n. 13, but none involved a grant so ideologically significant as a special copyright on a major theological text.

95. See note 22 *supra* and accompanying text.

*and Health*, which would have expired in 1981 if treated under the general copyright laws, is now until 2046;[96] and numerous editions of *Science and Health* which, like the first in 1875, were in the public domain because their copyrights had expired, as well as others which, like the final edition of 1910, were also in the public domain because never copyrighted, are now subject to the long-term copyright First Church derived from Private Law 92–60. Scant authority, if any, exists for such a dramatic departure from copyright practice. As holder of the new copyright, First Church is no mere recipient of an "incidental benefit." Rather, it is the beneficiary of an extraordinary privilege, whose value is only partially reflected in the legal control it now possesses over the many editions of *Science and Health* by virtue of Private Law 92–60.

In interceding on behalf of First Church, Congress did more than grant a copyright, even one with the stupendous features accorded by the special law. After considering the content of *Science and Health* and the claim of First Church upon it, it awarded the Church the extended copyright for the stated purpose of ensuring that all published versions would conform to the Church's religious needs, that all aspects of central church doctrine would remain pure, and that the public would be spared confusion over the authentic version of *Science and Health*. Congress thus unequivocally and unqualifiedly endorsed First Church as first interpreter and guardian of that work.[97] In so doing it approved, both literally and figuratively, the Church as possessor of special rights in the text of *Science and Health* as against all others—Christian Science dissidents, historians, and the public at large.

Should United Christian Scientists or others undertake to publish *Science and Health*—even those editions which, until passage of Private Law 92–60, were in the public domain—they can do so only with leave of First Church simply because Congress has chosen to endow it with authority to veto any and all publication decisions concerning that work. In *Larkin v. Grendel's Den*,[98] the Supreme Court held that conferral of a veto power, over even a less ideologically significant benefit, had the primary effect of advancing religion. There the Court voided a state law affording religious establishments a veto over awards of local liquor licenses. Two considerations, both pertinent here, informed that holding:

> [A]ppellants have not suggested any "effective means of guaranteeing" that the delegated power "will be used exclusively for secular, neutral, and nonideological purposes." ... In addition, the mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred.[99]

First Church asserts that the veto authority derived from Private Law 92–60 is de minimus on the basis that the copyright does not empower it to impede the flow of debate over *Science and Health*, and will not be exercised to inhibit publication of any "authentic" version of the text.[100] We find this argument self-serving at best. As the party who motivated Congress to grant this copyright, the Church is ill-situated to depreciate its value. The very existence of this litigation bespeaks the advantage it has secured by means of Private Law 92–60. All others who seek to publish *Science*

---

**96.** See note 28 *supra.*

**97.** Cf. *Grand Rapids School Dist. v. Ball, supra* note 31, 473 U.S. at 389, 105 S.Ct. at 3226, 87 L.Ed.2d at 281:

> Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations as when it attempts to inculcate specific religious doctrines. If this identification conveys a message of government endorsement or disap-

proval of religion, a core purpose of the Establishment Clause is violated.

**98.** *Supra* note 63.

**99.** 459 U.S. at 125–126, 103 S.Ct. at 511, 74 L.Ed.2d at 306 (quoting *Committee for Pub. Educ. v. Nyquist, supra* note 31, 413 U.S. at 780, 93 S.Ct. at 2969, 37 L.Ed.2d at 967).

**100.** Brief for Appellant at 31–41.

*and Health* are subject to the vagaries of its approval or the threat of infringement charges if publication is unapproved. In consequence of Private Law 92–60, the Church alone can decide which of the many variant editions of *Science and Health* is "authentic," which if any are to be made available,[101] and for what sort of publication and by whom. In sum, First Church has acquired full dominion over public access to *Science and Health*. Congress has bestowed upon the Church not only symbolic recognition as guardian of the text, but also significant practical advantages in that role.

In conferring these benefits, Private Law 92–60 has the unmistakable effect of advancing the Church's cause. Establishment Clause precedent amply indicts governmental involvement in sectarian affairs of this sort.[102] As the Supreme Court has taught,

> an important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.[103]

In the case at bar, the impermissible message of sectarian endorsement and the correlative message of sectarian disapproval are not merely possibilities, but accomplished and formally attested facts.[104]

The judgment appealed from in this case is accordingly

*Affirmed.*

---

**101.** As previously discussed, see note 22 *supra* and accompanying text, it is possible to construe Private Law 92–60 as vesting in First Church rights of indefinite duration in any edition of *Science and Health* not in publication in 1971 and not yet slated for publication.

**102.** The prospect of this was several times considered during the hearings on this legislation. See, e.g., *Hearings, supra* note 51, at 18–20, 26–27, 30, 33–36.

**103.** *Grand Rapids School Dist. v. Ball, supra* note 31, 473 U.S. at 390, 105 S.Ct. at 3226, 87

L.Ed.2d at 281; see also *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 119, 73 S.Ct. 143, 156, 97 L.Ed. 120, 138 (1952) (holding unconstitutional a statute transferring control of church property from one church body to another on the ground that the statute impermissibly "intrudes for the benefit of one segment of a church the power of the state into the forbidden area of religious freedom contrary to ... the First Amendment").

**104.** Consequently, we do not reach the Free Exercise claim asserted by United Christian Scientists, nor its claim under the Copyright Clause.